[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
This appeal is taken from a final judgment of the Lake County Court of Common Pleas. Appellant, Sandor Davis, appeals from his conviction for arson following a trial by jury.
Appellant owned an alarm and locksmith business called A Action Alarm and Lock ("Action Alarm") in Lyndhurst, Ohio. In July 1995, Kathlene Snyder ("Snyder") began working at the company primarily in a secretarial capacity. Snyder and appellant, however, had known each other since 1987 because she had previously worked for him as a secretary at a different locksmith shop in Highland Heights, Ohio.
By early 1996, appellant had promoted Snyder to a supervisory position at Action Alarm. In addition to handling clerical duties, Snyder exercised complete control over the company's checking account.
During that year, the Internal Revenue Service was investigating the possibility that appellant owed back taxes on some of his corporate enterprises, including Action Alarm. On October 10, 1996, appellant confronted Snyder regarding the IRS investigation. He accused Snyder of talking to an agent from the IRS and terminated her employment at Action Alarm. In doing so, appellant threatened that he would get back at Snyder for talking to the IRS.
On the morning of October 25, 1996, Snyder awoke at her residence in Mentor-on-the-Lake in Lake County, Ohio to find that her 1989 Mercury Sable station wagon had been vandalized during the night. Three windows were smashed, all four tires were slashed, and sugar had been dumped into the gasoline tank. Snyder contacted the Mentor-on-the-Lake Police Department and filed a report.
Snyder paid to have the automobile repaired. Barely a week later, on November 2, 1996, she awoke to find that the windows on the car were blackened. Upon opening the driver's side door, she found that the interior had been set afire and had suffered significant damage from the smoke and flames. Snyder called the police who immediately launched an arson investigation in conjunction with the Mentor-on-the-Lake Fire Department.
A fire investigator collected various pieces of evidence and then forwarded them to the Lake County Regional Forensic Laboratory for testing and analysis. At the crime lab, the examiners discovered gasoline on a piece of foam padding from the front seat and a partially scorched jacket that had been left on the seat.
In her statement to the police, Snyder indicated that she believed appellant was responsible for setting the fire. As a result, the police quickly focused on appellant as a prime suspect. During the course of their investigation, the police questioned two teenage males, Ryan A. Hartman ("Hartman") and Ronald W. Stevens, Jr. ("Stevens"), about the incident. Each young man admitted his responsibility for the arson and told the police that appellant had paid him $250 to torch Snyder's automobile. Moreover, both indicated that appellant had, in fact, driven them from the Cleveland area to Mentor-on-the-Lake in the early morning hours of November 2, 1996 in order to set the car ablaze.
Based on this, the police turned the matter over to the Lake County Prosecutor's Office. On May 23, 1997, the Lake County Grand Jury returned a two-count indictment against appellant: (1) Count One alleged arson in violation of R.C. 2909.03(A)(4), a felony of the third degree; (2) Count Two alleged arson in violation of R.C. 2909.03(A)(1), a felony of the fourth degree.
The case proceeded to a jury trial on August 25, 1997. The state called ten witnesses to the stand, including Hartman and Stevens. During the presentation of the defense case, appellant testified on his own behalf and denied playing any role in the burning of Snyder's vehicle. Following a two-day trial, the jury returned guilty verdicts against appellant on both counts of arson. The matter came on for sentencing on September 24, 1997 at which time the trial court ordered appellant to serve three years in prison on Count One. Count Two was merged into Count One for purposes of sentencing.
From this judgment, appellant perfected a timely appeal in this court. He now asserts the following assignments of error:
 "[1.] The trial court erred to the prejudice of defendant-appellant by allowing the state to present evidence of other crimes, wrongs, or acts in contravention of Evid.R. 404(B).
 "[2.] The trial court erred to the prejudice of defendant-appellant by denying defendant-appellant due process of law and effective assistance of council [sic] in violation of the Ohio and United States Constitutions where the trial counsel fell below and [sic] objective standard of reasonable representation.
 "[3.] The trial court erred to the prejudice of defendant-appellant by denying defendant-appellant due process of law in violation of the Ohio and United States Constitutions where he was denied the right to confront witnesses who testified against him.
 "[4.] The trial court erred to the prejudice of defendant-appellant by denying defendant-appellant due process of law as guaranteed by the Ohio and United States Constitutions where the trial court erred by refusing to allow the defendant-appellant to present expert testimony to aid in his defense.
 "[5.] The trial court erred to the prejudice of defendant-appellant by improperly instructing the jury on the issue of aiding and abetting on a complicity theory.
 "[6.] The trial court erred to the prejudice of defendant-appellant in convicting him against the manifest weight of the evidence."
 I.
In his first assignment of error, appellant posits that the trial court erred by allowing the prosecution to present evidence regarding other crimes, wrongs, or acts perpetrated by appellant in contravention of Evid.R. 404(B). Before addressing the specific examples cited by appellant, some background discussion of Evid.R. 404(B) and its requirements is in order.
Evid.R. 404(B) provides as follows:
 "(B)Other Crimes, Wrongs or Acts. Evidence of the other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
This rule provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith on a particular occasion. Although Evid.R. 404(B) applies in both civil and criminal cases, it most often arises in the context of the latter.
In a criminal proceeding, Evid.R. 404(B) governs the admissibility of an accused's criminal or otherwise wrongful acts as proof that the accused committed the crime charged. See, also, R.C. 2945.59.[1] The "other acts" evidence embraced by the rule is broad enough to encompass any extrinsic act committed by the accused that is not part of the operative conduct for which the accused is being prosecuted.
The first sentence of Evid.R. 404(B) sets forth a basic rule of exclusion, to wit: evidence of other crimes, wrongs, or acts must be excluded if it is being offered to prove that the defendant had a propensity to commit the offense charged. However, the second sentence of the rule operates to limit the breadth of the exclusion by making other acts evidence admissible when it is offered for a purpose other than to prove conforming conduct.
Evid.R. 404(B) sets forth a nonexhaustive list of proper bases upon which evidence of other crimes, wrongs, or acts may be offered. Weissenberger's Ohio Evidence (1998), Section 404.23, at 114. The paramount question in determining the admissibility of such evidence is whether it is being introduced only to prove character and conforming conduct or, alternatively, whether it is being offered to prove some other relevant fact of consequence to the proceeding. The burden is on the proponent of the other acts evidence to demonstrate its admissibility under Evid.R. 404(B).
The admissibility of evidence under Evid.R. 404(B) is within the sound discretion of the trial court. State v. Matthews
(1992), 80 Ohio App.3d 409, 415. See, generally, State v. Sage
(1987), 31 Ohio St.3d 173, paragraph two of the syllabus ("The admission or exclusion of relevant evidence rests within the sound discretion of the trial court."). An appellate court will not reverse the decision of a trial court in the absence of an abuse of discretion. In this context, an abuse of discretion connotes more than an error of law or judgment; rather, it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. State v. Montgomery (1991), 61 Ohio St.3d 410,413; State v. Adams (1980), 62 Ohio St.2d 151, 157.
In the case sub judice, appellant asserts that the trial court abused its discretion by allowing the state to elicit testimony from various witnesses relating to other crimes, wrongs, or acts. Appellant suggests that this was done solely for the purpose of prejudicing the jury against him and that the testimony presented was unrelated to the offense for which he was on trial.
We will briefly address the examples alluded to by appellant. Before doing so, however, we make two observations. First, defense counsel did not object to many of the statements to which appellant now takes exception. The failure to object generally constitutes a waiver of any error on appeal. State v. Lewis
(1993), 67 Ohio St.3d 200, 203; State v. Thompson (1987), 33 Ohio St.3d 1,13. Pursuant to Crim.R. 52(B), however, we have the power to recognize plain errors or defects involving substantial rights even if they were not brought to the attention of the trial court. State v. Moreland (1990), 50 Ohio St.3d 58, 62. In the context of a criminal case, a court of review should invoke the plain error doctrine only under exceptional circumstances and only to prevent a manifest miscarriage of justice. State v. Jenks
(1991), 61 Ohio St.3d 259, 282; State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus. Plain error does not exist unless, but for the error, the outcome of the trial would have been different. Jenks, 61 Ohio St.3d at 282; Moreland,50 Ohio St.3d at 62; Long, 53 Ohio St.2d at paragraph two of the syllabus.
Second, appellant mischaracterizes many of the statements as having been admitted under Evid.R. 404(B). There is very little in the transcript to suggest either that the prosecutor invoked or the trial court relied on Evid.R. 404(B) in admitting the statements.
Much of the evidence consisted of a given witness' account of oral statements made by appellant in the presence of the witness. These statements did not relate to other criminal acts perpetrated by appellant, but rather were merely remarks made by appellant that tended to incriminate him.
Evid.R. 404(B) speaks to the admission into evidence of a person's criminal or otherwise wrongful "acts." Evid.R. 801(D)(2), by contrast, controls the admission of verbal statements made by a party to the litigation, including the defendant in a criminal case. Specifically, Evid.R. 801(D)(2)(a) provides for the admissibility of out-of-court statements made by a party in his or her individual or representative capacity.[2] Such party-opponent admissions do not represent an exception to the hearsay rule, but instead are simply excluded from the definition of hearsay.
We turn now to the examples cited by appellant. The first one stems from the testimony of Randi Petkosh ("Petkosh"). Appellant hired Petkosh to do clerical work at Action Alarm beginning in October 1996 immediately after Snyder had been terminated from the company. Appellant told Petkosh that he had to fire Snyder because she had embezzled money from the Action Alarm checking account and she had also talked to the IRS about appellant's business dealings.
At trial, Petkosh testified without objection that appellant "called her [Snyder] several vulgarities, that he wanted to get back at her, he was trying to find out where she lived, basically trying to get back at her for supposedly what she had done to him." Subsequently, over an objection by defense counsel, Petkosh was permitted to testify that while speaking on the telephone with someone named "Ryan," appellant "asked him if all the glass was broken, did he put the sugar in the gas tank, did he slash the tires."
The first statement by Petkosh did not fall within the purview of Evid.R. 404(B). While the statement was admissible to establish appellant's mental state just prior to the commission of the arson, it was not evidence of another act of criminality committed by appellant. Moreover, appellant's statement that he "wanted to get back at" Snyder was admissible pursuant to Evid.R. 801(D)(2)(a).
With regard to the second statement, an argument could be made that it was within the scope of Evid.R. 404(B) because it showed appellant's preparation, plan, and knowledge of the vandalism acts carried out on the vehicle. The October 25, 1996 vandalism act formed the immediate background of the arson incident on November 2, 1996. Petkosh's testimony demonstrated that appellant had intimate knowledge of the first act of vandalism. As such, it constituted extrinsic evidence that was inextricably linked to the offense charged and was, therefore, admissible under the rule.
Appellant next complains of the testimony of Robert J. Bligh ("Bligh") and Glenn E. Mason ("Mason"). Bligh was an apprentice locksmith who was hired by appellant in October 1996 immediately after Snyder had been fired. He testified on direct examination by the prosecutor that appellant instructed him on approximately five occasions to follow Snyder in order "[t]o find out what kind of car she was driving." There was no objection to this testimony.
Again, it is manifestly obvious that the admissibility of this testimony did not rise or fall on Evid.R. 404(B). Bligh's statement did not relate to a criminal act perpetrated by appellant. Rather, it was simply some evidence showing that appellant prepared to torch Snyder's automobile by first ascertaining the make and model of the vehicle to be targeted.
Mason was a locksmith at Action Alarm for three years, including the time period during which Snyder worked at the company. On direct examination, Mason testified that appellant often instructed him to drive by Snyder's residence in the evening to see whether or not she was home. After Snyder's termination, Mason indicated that appellant asked him "if I would either vandalize the car or knew anybody that might do the same." Defense counsel did not object to this testimony.
This statement could have been admitted as a party-opponent admission under Evid.R. 801(D)(2)(a). Moreover, Mason's testimony could also be construed as falling within the ambit of Evid.R. 404(B). Specifically, the testimony about appellant asking Mason to vandalize the car went to intent, preparation, and plan. Conspiring to commit vandalism is a criminal offense, thereby rendering Mason's testimony admissible as evidence of appellant's arson scheme.
Appellant next takes issue with certain testimony offered by Snyder. Most of the testimony complained of went to the background relationship between appellant and Snyder. Although her testimony did not amount to other acts evidence under Evid.R. 404(B), it was clearly admissible as being relevant to appellant's motive for committing the crime. For instance, Snyder testified that "Sandor told me that he knew I talked to the IRS and that nobody screws with his family and * * * that he knows where my mom and my sister live." Obviously, appellant's firing of Snyder for allegedly talking to the IRS formed the fundamental backdrop of the case. Such evidence was admissible to establish appellant's motive for committing the offense charged.
Finally, appellant points to testimony offered by Hartman on the witness stand as an example of improper character evidence. After overruling an objection by defense counsel, the trial court allowed Hartman to testify that appellant asked him to beat up another employee who had supposedly cost appellant money.
Assuming arguendo that Hartman's testimony did not fall within any of the proper bases delineated in Evid.R. 404(B), it did not constitute reversible error in this instance. At worst, it was harmless error in light of the other abundant evidence adduced at trial pointing to appellant's guilt. See Columbus v. Taylor
(1988), 39 Ohio St.3d 162, 166 (holding that error in the admission of other act testimony is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction).
In light of the foregoing analysis, we conclude that the trial court did not abuse its discretion by admitting improper character evidence in contravention of Evid.R. 404(B). Appellant's first assignment is without merit.
 II.
Appellant's second assignment of error is predicated on his belief that he was denied the effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution. In order to demonstrate ineffective assistance of trial counsel, a criminal defendant must satisfy a two-part test as formulated by the United States Supreme Court in Strickland v.Washington (1984), 466 U.S. 668. First, the defendant must show that counsel's performance was deficient in that the representation fell below an objective standard of reasonableness.Strickland, 466 U.S. at 687-688. Second, it must be shown that counsel's deficient performance prejudiced the defendant. Id. at 687. In this context, prejudice means that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. Id. at 694.
The Supreme Court of Ohio has endorsed the Strickland test for determining the issue of ineffective assistance of counsel. SeeState v. Bradley (1989), 42 Ohio St.3d 136, 141-142. This court has likewise embraced the Strickland standard. See, e.g., Statev. Patterson (May 22, 1998), Trumbull App. No. 96-T-5439, unreported, at 20-21, 1998 Ohio App. LEXIS 2289; Mentor v.Richardson (Dec. 26, 1997), Lake App. No. 96-L-155, unreported, at 8-9, 1997 Ohio App. LEXIS 5853.
Appellant offers several different ways in which his trial counsel's performance was allegedly deficient. The first issue raised by appellant is the failure of counsel to object to a supposed plethora of improper character evidence. This is a reference to the testimony that appellant alleged was improperly admitted under Evid.R. 404(B) in his first assignment of error.
It is true that counsel did not object to most of this testimony as was detailed previously. However, it is also true that virtually all of the testimony complained of by appellant was clearly admissible under either Evid.R. 801(D)(2)(a) or Evid.R. 404(B). It suffices to say, therefore, that a finding of deficient representation will not be predicated upon counsel's failure to object to admissible testimony.
The second issue raised by appellant has to do with counsel's cross-examination of Snyder. Specifically, appellant suggests that counsel should have cross-examined Snyder regarding her involvement in a number of deceitful activities, including welfare fraud. There is nothing in the record before us, however, to indicate that Snyder was engaged in any illicit activity beyond the mere assertion in appellant's brief. We, therefore, decline the invitation to deem counsel's representation to have fallen below an objective standard of reasonableness because he did not cross-examine Snyder regarding such matters.
Finally, appellant contends that counsel was ineffective based on his failure to inform the jury that Hartman and Stevens had received favorable plea bargains in exchange for testifying against appellant. According to appellant, counsel should have developed the potential defense that Hartman and Stevens were lying in order to plead to lesser charges and receive reduced sentences for their respective roles in the arson.
At the time of the offense, Hartman was still a juvenile, whereas Stevens was nineteen years old. On direct examination, the prosecutor elicited the following from Hartman:
 "Q. Were you charged in connection with lighting the fire in the car, criminal charges; did you get charged?
"A. Yes.
"* * *
 "Q. You were charged in the Juvenile Court here; were you not?
"A. Yes. Yes, I'm sorry.
"Q. And you entered a plea?
"A. Yes.
"Q. That you were responsible for a misdemeanor?
"A. Misdemeanor, first degree.
 "Q. Correct. You made an agreement to testify here today?
"A. Yes.
 "Q. In exchange you would not be prosecuted by way of a felony; is that correct?
"A. Yes."
In a similar vein, the prosecutor questioned Stevens on direct examination about the deal that he had struck in exchange for his testimony against appellant. Stevens admitted that he had pled to one count of arson with no promise as to what the state's recommendation would be with regard to sentencing.
Upon review of the transcript, it is apparent that the state wisely opted to question both Hartman and Stevens on direct examination about the deals they had cut in exchange for testifying against appellant. By eliciting this testimony on direct examination, the state somewhat undercut the ability of the defense to capitalize on the plea bargains on cross-examination.
This information, therefore, was made available to the jury. At most, the failure of appellant's counsel to pursue this line of questioning further on cross-examination was a vaguely questionable trial strategy. It did not, however, amount to deficient representation.
Appellant has not shown that counsel's representation fell below an objective standard of reasonableness as required underStrickland and its progeny. Consequently, appellant's second assignment is not well-taken.
 III.
Pursuant to his third assigned error, appellant proposes that the trial court erred by denying him the right to confront witnesses who testified against him. Specifically, appellant takes the position that the trial court unfairly prevented his counsel from cross-examining Hartman, Stevens, and Petkosh on matters relating to their credibility.
With regard to Hartman and Stevens, appellant basically claims that his counsel was deprived of the right to cross-examine them about their criminal backgrounds. A review of the transcript reveals otherwise. Counsel questioned Hartman about various prior criminal cases lodged against him. Stevens, meanwhile, actually showed up in prison garb to testify because he was in the midst of serving a six-month sentence for breaking and entering at the time of appellant's trial. Counsel thus had ample opportunity to delve into Stevens' criminal record.
As for Petkosh, appellant points to the following query posed to her on cross-examination as proof that his counsel was denied the ability to inquire into her credibility:
 "Q. * * * Are you presently under indictment in Cuyahoga County?
"[THE PROSECUTOR]: Objection.
"THE COURT: Sustained."
This was the sum total of the exchange as contained in the transcript. In his brief before this court, appellant provides slightly more of a context for the question by suggesting that his counsel had information that a criminal case was pending against Petkosh in Cuyahoga County in which appellant was to testify against her.
Even assuming for the sake of argument that this was true, we perceive no abuse of discretion on the part of the trial court in sustaining the prosecutor's objection to the question posed. Evid.R. 609 allows the credibility of a witness to be impeached byevidence of conviction of felonies and misdemeanor crimes involving dishonesty or false statements. This rule would clearly not apply if Petkosh merely had an indictment pending against her at the time of the trial, as opposed to having an actual prior conviction.
Moreover, there is nothing in the record to suggest that this proposed line of questioning of Petkosh would have been proper under Evid.R. 608(B). Pursuant to this rule, specific instances of the conduct of a witness may be inquired into on cross-examination if they are clearly probative of the witness' character for truthfulness or untruthfulness. Counsel did not proffer any evidence to suggest that the pending indictment related to conduct by Petkosh that was probative of her character for truthfulness or untruthfulness. Given this, there is no basis upon which to conclude that the question asked of Petkosh was proper under Evid.R. 608(B).
The trial court did not deny appellant the right to confront Hartman, Stevens, and Petkosh on cross-examination. Appellant's third assignment is devoid of merit.
 IV.
In his fourth assignment of error, appellant posits that the trial court erred by excluding certain expert testimony that would have buttressed his defense. Appellant maintains that this expert testimony was crucial to refuting the prosecution's theory of the case.
According to the state, appellant left his home on the east side of Cleveland in Cuyahoga County during the early morning hours of November 2, 1996. He drove a grey minivan that he owned to the west side of Cleveland in order to rendezvous with Hartman and Stevens at the former's house.
After picking up the two teenagers, appellant then drove to Snyder's residence in Mentor-on-the-Lake in Lake County. He dropped Hartman and Stevens off near the 1989 Mercury Sable station wagon belonging to Snyder. Upon doing so, appellant circled the block in his minivan for a few minutes while the two young men committed the arson.
Once the deed had been done, appellant picked Hartman and Stevens up again in the minivan and then drove them home to the west side of Cleveland. Finally, appellant returned to his own home on the east side of town.
It was uncontroverted that this version of events would have entailed at least three hours of nighttime driving by appellant. At trial, the main defense theory was that appellant was physically incapable of driving to the extent indicated by the testimony of his co-conspirators, Hartman and Stevens. Specifically, the defense attempted to establish that appellant could not drive at night for the length of time and distances involved.
The defense brought forth Dr. John P. Sheehan ("Dr. Sheehan") to testify on direct examination. Dr. Sheehan is an endocrinologist who began treating appellant for diabetes in 1988. When called to the stand, Dr. Sheehan reviewed a litany of physical problems afflicting appellant. According to the doctor, appellant suffered from diabetes which significantly impaired his night vision, blockage in the carotid artery, Crohn's disease, kidney disease, and circulatory problems which inhibited his ability to feel any sensation in his feet.
The defense especially wanted to focus the attention of the jury on appellant's impaired vision at night stemming from his diabetic condition. To this end, counsel engaged Dr. Sheehan as follows:
 "Q. Now you had mentioned Mr. Davis' night vision is minimized?
"A. Right.
"Q. How much so would you say?
 "A. Very significant. I'm not an ophthalmologist, but it's very common for people with diabetes who have eye changes to have diminished vision at night particularly.
 "Q. Now, Dr. Sheehan, I want to read you a hypothetical and I'm going to ask you for your medical opinion based on your experience.
 Now between 1:00 and 1:30 in the morning, it's dark out, * * * Mr. Davis gets into a van to drive from his Lyndhurst home, drives to the west side of Cleveland, which would take approximately 45 minutes, after getting to the west side of Cleveland he drives back to Mentor-on-the-Lake, which would take approximately 45 minutes[.] * * * [H]e drives back to the west side of Cleveland, which again would take approximately 45 minutes, after getting to the west side of Cleveland he drives back to Lyndhurst, which is another 45 minute trip. Based on your training and your experience treating Mr. Davis, do you think this is feasible?
"[THE PROSECUTOR]: Objection.
"THE COURT: Sustained."
On appeal, appellant argues that the trial court erred by sustaining the prosecutorial objection to the "hypothetical" question as posed to Dr. Sheehan. Appellant specifically takes exception with the fact that the trial court appeared to sustain the objection because the question encompassed an ultimate issue of fact that had to be decided by the jury.
Evid.R. 702 governs the admissibility of the testimony of experts in Ohio. The rule provides in relevant part:
 "A witness may testify as an expert if all of the following apply:
 "(A)The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 "(B)The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 "(C)The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *"
The rationale behind Evid.R. 702 is rooted in the fact that the jury is unable to draw proper inferences from the facts in certain situations. An expert witness, however, is qualified to arrive at such conclusions by reason of his or her expertise in a particular field. In determining whether to permit expert testimony in a given case, the trial court must necessarily exercise sound discretion. Thus, upon review of the trial court's decision, an appellate court will not reverse absent an abuse of discretion.State v. Awkal (1996), 76 Ohio St.3d 324, 331-332.
Evid.R. 704 does state that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Thus, the trial court was incorrect to the extent that it found the question posed to Dr. Sheehan to be objectionable because it called for the doctor's opinion on an ultimate issue of fact to be decided by the jury.
However, we still decline to hold that the trial court's ruling constituted prejudicial error for two reasons. First, Dr. Sheehan was an endocrinologist, not an opthamologist. The doctor conceded as much in his testimony. Dr. Sheehan was only qualified to testify as an expert with regard to those physical conditions for which he had examined and treated appellant.
The question posed to Dr. Sheehan was directed at appellant's diminished night vision, not his general stamina. There was, however, no evidence introduced to indicate that the doctor had ever actually tested appellant's eyesight and come to a determination about its quality or lack thereof. In fact, on cross-examination by the prosecutor, Dr. Sheehan admitted that he had never treated appellant's eyes or any allied visual complications. Thus, while it may have been proper for Dr. Sheehan to testify about the diminished night vision experienced by diabetics in general, there was no foundation laid to justify a response to the question about appellant's eyesight in particular.
Second, despite the fact that he was barred from answering that query, Dr. Sheehan had ample opportunity in other responses to inform the jury that appellant most likely suffered from poor eyesight due to diabetes. Dr. Sheehan stated that appellant had "significant diabetic eye disease which had compromised his vision significantly, particularly his night vision." The doctor also opined that appellant could probably "drive short distances with good daylight but his night vision is such that I think he would have a lot of difficulties."
One final observation is in order. Although the trial court sustained the objection to the hypothetical, it is clear that Dr. Sheehan nevertheless was able to provide significant testimony to advance the main defense theory. This is evident from the fact that appellant's counsel stated the following in closing arguments to the jury:
 "And I specifically asked if in his best medical opinion, based on his treatment of Sandor Davis since 1988[,] he thought that he [appellant] could do this driving. He said no * * *. This is the man who advises Mr. Davis and he, in his opinion, said he [appellant] couldn't do it and this has not been rebutted."
Thus, the defense was hardly prevented from presenting its core theory of innocence to the jury, and the trial court did not commit prejudicial error by disallowing the question posed to Dr. Sheehan. Appellant's fourth assignment is not well-taken.
 V.
Appellant next proposes that the trial court erred in instructing the jury. He raises several points under this assigned error, and we will examine each in turn.
The state prosecuted appellant under a complicity theory of liability. Although Hartman and Stevens actually committed the offense of arson, the state proceeded under the hypothesis that appellant was an accomplice to the crime because he aided and abetted in its commission. See R.C. 2923.03(A)(2). As an accomplice, appellant was just as guilty of the substantive offense as the principal offenders.
At the conclusion of closing arguments, the trial court instructed the jury on the elements of the two counts of arson contained in the indictment. The trial court also instructed the jury on accomplice liability and the definition of "aid and abet." Finally, the trial court gave the jury the cautionary instruction regarding the testimony of an accomplice as required by R.C.2923.03(D) and recommended by 4 Ohio Jury Instructions (1997), Section 405.41, at 44-45.[3] See, also, State v. O'Dell
(1989), 45 Ohio St.3d 140, 145 (noting that the statutory requirement of corroboration of an accomplice's testimony was deleted when the cautionary instruction was enacted).
During the course of deliberations, the jury foreman sent a written note to the judge stating that the jury wished clarification on the definition of aid and abet and the need for appellant to be in the area at the time of the commission of the arson. The trial court responded with a one-page typed response in which it restated the definition of aid and abet. In doing so, the trial court also clarified that a defendant need not have been present at the actual commission of a crime if he or she otherwise met the requirements of aiding and abetting another to commit the criminal act. Defense counsel objected to the trial court's answer on the general basis that it was misleading, but failed to articulate with any precision what was misleading about the response.
On appeal, appellant claims reversible error on several fronts. First, appellant complains that the trial court did not repeat the R.C. 2923.03(D) cautionary instruction in its note to the jury. This, however, was not error.
The trial court was required to give the instruction in its initial charge to the jury, and it did so. There was no reason for the trial court to include the warning again when responding to the question from the jury foreman. The one-page typed document sent back to the jury room was a specific response to the question that had previously been submitted. It was not, as appellant seems to suggest, a complete set of instructions meant to guide the jury through the process of its deliberations.
Second, appellant complains that the trial court did not reiterate the definition of "knowingly" when responding to the note from the jury foreman. A review of the transcript reveals that the trial court did instruct the jury as to the definition of "knowingly" in its initial charge. Again, there was no need for the trial court to repeat this when answering the jury's query. Indeed, the jury requested clarification not on the mens rea
element of the offense, but rather on what constituted aiding and abetting.
Finally, appellant complains because the trial court went beyond merely restating the definition of aid and abet in its response to the jury and gave a more complete explanation of complicity. We see no error in this regard. The trial court was simply describing the underlying theory of accomplice liability. By doing so, the trial court provided context for the definition of aid and abet that was forthcoming.
The trial court did not err in responding to the jury's question during deliberations. Appellant's fifth assignment is without merit.
 VI.
In his sixth and final assignment, appellant proposes that the jury's verdicts convicting him of both counts of arson were against the manifest weight of the evidence. The test for whether a criminal conviction runs counter to the weight of the evidence is as follows:
 "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983), 20 Ohio App.3d 172, 175. See, also, State v. Thompkins (1997), 78 Ohio St.3d 380, 390
(Cook, J., concurring).
As a general matter, the weight to be given the evidence and the credibility of witnesses are primarily for the trier of fact to decide. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. When reviewing questions of weight, the role of an appellate court is to engage in a limited weighing of the evidence adduced at trial in order to determine whether the state appropriately carried its burden of persuasion.
After reviewing the record, it is apparent that the verdicts were entirely supported by the weight of the evidence. Both Hartman and Stevens testified that appellant asked them to burn Snyder's automobile, drove them to Snyder's residence in Mentor-on-the-Lake, and then paid them $250 apiece after the job was done.
The state also introduced a tape containing a telephone conversation between Stevens and appellant that was recorded by the Euclid Police Department. After Stevens had confessed to his role in the arson, the police decided to have him call appellant on the telephone in an attempt to gather evidence against appellant. During the telephone conversation, appellant did not expressly admit that he hired the two teenagers to torch Snyder's car. Appellant, however, did discuss the fire with Stevens and counseled the young man not to admit anything when the police questioned him.
In addition to the testimony of appellant's co-conspirators, the state also presented the testimony of Snyder, Petkosh, Bligh, and Mason. Their testimony provided compelling evidence that appellant conspired to exact revenge against Snyder by burning her vehicle. As just one example, Mason testified that appellant talked openly around the Action Alarm office about his plans to have Hartman and Stevens burn the car.
In light of the evidence introduced at trial, we certainly do not conclude that the jury lost its way or created a manifest miscarriage of justice such that appellant's convictions and sentence must be reversed and a new trial ordered. Appellant's sixth assignment is not well-taken.
 VII.
Based on the foregoing analysis, appellant's assignments of error are without merit. Accordingly, the judgment of the trial court is affirmed. __________________________ JUDGE JUDITH A. CHRISTLEY
FORD, P.J., concurs with Concurring Opinion,
NADER, J., concurs in judgment only.
[1] R.C. 2945.59 provides:
 "In any criminal case in which the defendant's motive or defendant's, the absence of mistake or accident on his part, or the scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."
[2] Evid.R. 801(D)(2)(a) reads as follows: "A statement is not hearsay if: * * * [t]he statement is offered against a party and is * * * his own statement, in either his individual or representative capacity[.]"
[3] R.C. 2923.03(D) reads:
 "(D) If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:
 "`The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.
 "`It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.'"
 CONCURRING OPINION