OPINION
Defendant, Eduardo Bonilla, appeals from his conviction and sentence on a variety of charges including complicity to commit aggravated murder, complicity to commit murder and complicity to commit kidnapping.
The evidence presented by the State at trial demonstrates that Mark "Corky" Miller sold drugs in the Dayton, Ohio, area. During the first six months of 1998 Defendant supplied large quantities of drugs to Miller for sale. In June 1998, just two days after meeting Stephanie Harden, Defendant was arrested in Dayton and spent a few days in jail. When Defendant was released on bail he immediately returned home to Chicago, accompanied by Stephanie Harden.
In August 1998, Waiman Yu and Tommy Oiler rented an apartment at Mallard Landing in Beavercreek, Ohio. Oiler and Yu would periodically collect money from drug sales made in the Dayton area and transport that money to Chicago where they turned the money over to Jose Lopez. Defendant would then take the money to Lazaro Amezcua ("Begotez"). On one of these trips to Chicago on or about September 30, 1998, Oiler met Defendant outside Lopez's apartment. A few days earlier, Amezcua had threatened to kill Defendant and Lopez if they didn't get him the money he was owed. Defendant told Stephanie Harden that he would have to come back to Ohio and get his money from Miller one way or another.
On or about October 1, 1998, Waiman Yu and Tommy Oiler drove back from Chicago to Dayton. Jose Lopez, Stephanie Harden and Defendant were also in the car. During the drive back Oiler overheard a conversation between Defendant and Lopez wherein Defendant told Lopez that they would get their money from Corky Miller one way or another, either kill him or kidnap him. According to Oiler, Corky Miller owed a large drug debt.
After arriving back in Dayton, later that same day Oiler was present at a home in Vandalia when Defendant again repeated to Lopez that they had to get their money from Miller one way or another, if they had to kidnap him or kill him. Shortly thereafter, Vandalia police arrived at the scene and Oiler was arrested on outstanding warrants. Oiler told Vandalia police officer Dana Brown that Defendant and Lopez were drug dealers who were down here from Chicago and they planned on killing Corky Miller. Officer Brown contacted Det. Cole from the Beavercreek police department. Det. Cole spoke to Oiler who told him about the Dayton to Chicago drug operation and that Defendant and Lopez were down here from Chicago to either kidnap or kill Corky Miller because of a large debt that was owed.
On or about Friday, October 2, 1998, Lazaro Amezcua and a person known only as Victor came down to Dayton from Chicago. They were taken to Waiman Yu's apartment at Mallard Landing in Beavercreek, Ohio. The next day, Saturday, October 3, 1998, Stephanie Harden drove Victor and Jose Lopez to a Meijer's store where they purchased various types of ammunition and a fillet knife. Defendant spent much of that day with Corky Miller. Later that evening Defendant and Stephanie Harden drove to Yu's apartment at Mallard Landing where they met up with Jose Lopez, Lazaro Amezcua and Victor. While at that apartment Stephanie Harden overheard Amezcua telling Defendant about a plan to kidnap Corky Miller and take him back to Chicago if he didn't give the money to Amezcua and Defendant. Amezcua demonstrated for Defendant how he would tackle Miller from behind and tie him up with duct tape.
The next day, Sunday October 4, 1998, Defendant and Stephanie Harden drove to Rooster's restaurant about 3:30 p.m. where they picked up Corky Miller. After dropping Miller off at his home so he could pick up his own car, Defendant and Stephanie Harden proceeded on to Yu's apartment at Mallard Landing with Corky Miller following them. Along the way Defendant said to Stephanie Harden: "That fool is about to die."
When they arrived at Yu's apartment at Mallard Landing, Defendant told Stephanie Harden that he was scared he would not make it out of there alive. Defendant also said we have to get this money one way or another. Defendant told Stephanie Harden that once they entered she should go to the bedroom, close the door, and not come out no matter what until he told her to do so. Shortly after arriving, Defendant left and returned a few minutes later with Jose Lopez. After entering the apartment Defendant locked the front door behind him.
Stephanie Harden was watching out the bedroom door that was partially open. She heard Jose Lopez tell Corky Miller that the drugs were in the suitcase on the floor, take a look and tell us what you think. When Miller bent down to look in the suitcase, Amezcua tackled Miller from behind and tried to wrestle Miller to the ground. Miller pulled out a gun and shot at Amezcua who then shot back. The two men fired back and forth at each other until Amezcua fell to the ground. When Miller then tried to run to the front door, Victor shot him several times in the back and Miller collapsed.
Corky Miller died in the apartment from his gunshot wounds. Jose Lopez and Defendant carried Amezcua to Stephanie Harden's car and along with Victor they all headed back to Chicago. Along the way Defendant wrapped Victor's gun up in his socks and threw it out the car window. Just a couple of exits before reaching Crown Point, Indiana, Victor decided to stop and get out of the car. Stephanie Harden, Defendant, Jose Lopez, and the mortally wounded Lazaro Amezcua proceeded on up Interstate 65 toward Chicago.
At the Crown Point, Indiana exit, Amezcua asked the others to get him to a hospital. They proceeded to follow road signs to St. Anthony's hospital. Jose Lopez and Defendant removed Amezcua from the car and laid him down on the ground in front of the emergency room entrance. Hospital security and an off duty deputy sheriff immediately stopped Defendant and Lopez and questioned them. Subsequently, they along with Stephanie Harden were taken into custody by Crown Point, Indiana police. The following day Beavercreek police detectives arrived in Crown Point, Indiana, and questioned Harden, Lopez and Defendant. After being returned to the Greene County, Ohio, jail, Defendant told a fellow inmate about the plan to kill Corky Miller because he owed money for drugs.
Defendant was subsequently indicted on several charges including one count of Complicity To Commit Aggravated Murder, two counts of Complicity To Commit Murder, one count of Complicity To Commit Kidnapping, one count of Complicity To Obstruct Justice, one count of Conspiracy To Commit Aggravated Murder, and one count of Conspiracy to Commit Murder. All of these charges were accompanied by a firearm specification.
At his jury trial Defendant denied participating in any plan to kidnap or kill Corky Miller. Defendant claimed that Corky Miller did not owe any money for drugs, and that no plan to kidnap or kill Miller ever existed. Defendant acknowledged that he had induced Miller to go to Yu's apartment at Mallard Landing, but Defendant claimed he did this so that Miller could purchase drugs from Amezcua.
The jury found Defendant guilty of all of the charges, but not guilty on all specifications. At sentencing the trial court merged several of the offenses, and imposed consecutive sentences upon Defendant which totaled Life plus thirty years. From his conviction and sentence Defendant has timely appealed to this court.
 FIRST ASSIGNMENT OF ERROR APPELLANT WAS DENIED A FAIR TRIAL DUE TO A PATTERN OF PROSECUTORIAL MISCONDUCT.
Defendant complains that throughout the trial the prosecutor engaged in a pattern of misconduct which deprived Defendant of a fair trial.
The conduct of the prosecuting attorney during the trial cannot be grounds for reversible error unless the conduct deprives the defendant of a fair trial. State v. Keenan (1993), 66 Ohio St.3d 402. In evaluating claims of prosecutorial misconduct, the touchstone of the analysis is the fairness of the trial, not the culpability of the prosecutor. State v. Lott (1990), 51 Ohio St.3d 160.
Defendant separates his claims of prosecutorial misconduct into three categories, the first of which is the pervasive use by the prosecutor of prior "bad acts." According to Defendant, during the trial the prosecutor repeatedly introduced evidence of previous bad actions by this Defendant unrelated to the offenses for which he was on trial in order to inflame the jury and convince them that Defendant is a bad person, and bolster an otherwise weak case.
For instance, Defendant complains because the prosecutor mentioned during opening statements that at the time of these offenses Defendant's girlfriend, Stephanie Harden, was just sixteen years old. Defendant further complains because Harden testified that several months prior to these offenses Defendant had sex with her at a motel; that four months prior to these offenses Defendant spent a few days in jail; and that Defendant hit her at about the time of these offenses. Additionally, Defendant complains because the State presented testimony by both occupants of the apartment directly adjacent to the one where this shooting took place. They testified regarding the damage to their apartment that resulted from this shooting when bullets came through their walls. According to Defendant, testimony by either Mr. or Mrs. Halstead would have sufficed. In all of these instances however, Defendant failed to object to the introduction of this evidence during trial. Accordingly, the error (if any) in admitting this evidence has been waived by Defendant's failure to object unless it rises to the level of "plain error." State v. Smith (1997), 80 Ohio St.3d 89. Plain error does not exist unless but for the error the outcome of the trial clearly would have been different. State v. Long (1978), 53 Ohio St.2d 91. We cannot say that but for the admission of this evidence Defendant clearly would have been acquitted of these charges. No plain error is demonstrated.
Defendant also complains about testimony by Steven Hunt that four months prior to this shooting he went to an auction with Defendant, Mark Miller and Jose Lopez, at which time Defendant purchased several cars, paying cash for them. Defendant's objection to this testimony, which was offered to demonstrate that Defendant was involved in drug trafficking, was sustained by the trial court. During his own testimony at trial Defendant admitted his involvement in drug dealing. No prejudicial error is demonstrated.
Defendant's next complaint of prosecutorial misconduct involves the withholding of documents by the prosecutor. Defendant complains because the State failed to disclose prior to trial a transcript of Tommy Oiler's videotaped statement to Detective Cole on October 1, 1998, and Detective Cole's written notes from that conversation. This material was turned over to defense counsel for their use in cross-examining Detective Cole. See Crim.R. 16(B)(1)(g). Defendant argues, however, that pretrial disclosure of this evidence would have aided the defense by enabling them to coordinate the statements made by Oiler to police with Defendant's trial testimony.
Because Oiler was neither a defendant nor a co-defendant, but rather simply a witness, his statement was not discoverable pursuant to Crim.R. 16(B)(1)(a). Oiler's statement was made available to the defense for use in cross-examining Detective Cole. Crim.R. 16(B)(1)(g). Oiler's statement was not subject to disclosure as evidence favorable to the Defendant, Crim.R. 16(B)(1)(f), because on its face the statement was anything but favorable to Defendant. In fact, it implicated Defendant in a plan to either kidnap or kill Corky Miller because of a drug debt that Miller owed. Oiler's statement is at best consistent in some minor aspects with the testimony subsequently given by Defendant at trial, something which the State could not have reasonably foreseen given that Defendant made no statements prior to trial revealing his version of these events. Defendant clearly had an opportunity before he testified to hear the statements made by Oiler to police, such that Defendant was able to mold his testimony to coincide with Oiler's statements if that was his desire. In any event, Defendant did not object or request from the trial court any form of relief or sanctions because of the State's failure to disclose this evidence before trial. Thus, any error has been waived.
Defendant additionally complains because the State failed to disclose prior to trial the statements made by Michael Roberts, a jailhouse informant, regarding what Defendant told him about these crimes. Those statements allegedly made by Defendant to Roberts were neither written nor recorded. They were oral statements, not made to a law enforcement officer, which were not reduced to any written summary. As such these statements were not discoverable per Crim.R. 16(B)(1)(a). No error, much less prejudicial error, has been demonstrated.
Defendant's final category of prosecutorial misconduct involves misleading the jury. According to Defendant, the State knowingly misled the jury when it presented testimony by Michael Roberts, the jailhouse informant, that Defendant had told him while in jail that when Corky Miller bent over, Defendant jumped him and cut him under the chin. Defendant told Roberts that the plan was to cut Miller's face off and take the body back to Chicago. Defendant argues that this testimony by Roberts was highly suspect and the State demonstrated a reckless disregard for the truth in presenting this testimony because the State was aware of a forensic report that indicated the only blood found on the knife belonged to Amezcua, not Corky Miller, and Stephanie Harden had testified that she witnessed the events and Defendant made no movement toward Miller. Dr. Nine testified, however, that the autopsy performed on Mark (Corky) Miller revealed the presence of a stab wound, one and one-half inches long and the same depth. The credibility of the witnesses and the weight to be given to their testimony are matters for the jury as trier of facts to decide. State v. DeHass (1967), 10 Ohio St.2d 230. No misconduct by the prosecutor, much less resulting prejudice, has been demonstrated.
The first assignment of error is overruled.
 SECOND ASSIGNMENT OF ERROR APPELLANT'S CONVICTIONS BASED ON COMPLICITY AND CONSPIRACY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Among the offenses Defendant was found guilty of committing were conspiracy to commit aggravated murder, conspiracy to commit murder, complicity to commit aggravated murder, complicity to commit murder, and complicity to commit kidnapping.
Conspiracy is defined in R.C. 2923.01 which provides in relevant part:
 (A) No person, with purpose to commit or to promote or facilitate the commission of aggravated murder, murder, kidnapping, compelling prostitution, promoting prostitution, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, engaging in a pattern of corrupt activity, corrupting another with drugs, a felony drug trafficking, manufacturing, processing, or possession offense, theft of drugs, or illegal processing of drug documents, the commission of a felony offense of unauthorized use of a vehicle, or the commission of a violation of any provision of Chapter 3734. of the Revised Code, other than section 3734.18 of the Revised Code, that relates to hazardous wastes, shall do either of the following:
 (1) With another person or persons, plan or aid in planning the commission of any of the specified offenses;
 (2) Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any of the specified offenses.
 (B) No person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by the accused or a person with whom the accused conspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed.
Complicity is defined in R.C. 2923.03:
 (A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
(1) Solicit or procure another to commit the offense;
(2) Aid or abet another in committing the offense;
 (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
 (4) Cause an innocent or irresponsible person to commit the offense.
Defendant argues that his convictions on the complicity and conspiracy charges are against the manifest weight of the evidence.
A weight of the evidence argument challenges the believability of the evidence, and asks which of the competing inferences suggested by the evidence is more believable or persuasive. State v. Hufnagle (Sept. 6, 1996), Montgomery App. No. 15563, unreported. The proper test to apply to that inquiry is the one set forth in State v. Martin (1983),20 Ohio App.3d 172, 175:
 [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the factfinder lost its way. State v. Bradley (October 2, 1997), Champaign App. No. 97-CA-03, unreported.
Defendant argues that his only involvement in these offenses which could arguably serve as a substantial overt act in furtherance of the conspiracy, and demonstrate that he actively participated and assisted in these crimes, was his conduct in allegedly luring or inducing Miller to go to the apartment at Mallard Landing so that Miller could be kidnapped or killed. This, however, implies prior knowledge and intent on Defendant's part, which Defendant claims the evidence in this case fails to demonstrate.
Although Defendant acknowledges that Tommy Oiler testified that during the drive from Chicago to Dayton on October 1, 1998, he overheard Defendant and Lopez discussing plans to either kidnap or kill Miller in order to get their money, Defendant points out that Stephanie Harden who was also in the car testified that no such conversation took place. Assuming the conversation did take place, Defendant asserts that no specific plans were made and Defendant was not assigned the task of getting Miller to come to Mallard Landing. According to Defendant, there is no evidence in this case which demonstrates that getting Miller to follow Defendant and Harden to Mallard Landing was intended to aid or assist in the kidnapping or killing of Miller. We disagree.
Tommy Oiler testified that during the drive from Chicago to Dayton on October 1, 1998, he overheard Defendant tell Lopez that they would get their money from Miller one way or another, either kidnap him or kill him. Later that same day at a house in Vandalia, Oiler again heard Defendant and Lopez discussing plans to kidnap or kill Miller. Oiler told both Vandalia and Beavercreek police about those plans.
Stephanie Harden testified that she heard Amezcua telling Defendant about a plan to kidnap Miller and take him back to Chicago if he did not pay the money to Amezcua and Defendant. On October 4, 1998, when Miller began to follow in his own car Defendant and Harden to the apartment at Mallard Landing, Defendant said to Harden: "That fool is about to die." When they arrived at Mallard Landing Defendant told Stephanie Harden: that he did not know if he would make it out of there alive; that they had to get their money one way or another; and that she should go into the back bedroom, close the door, and not come out no matter what until Defendant came to get her.
Michael Roberts testified that while he and Defendant were both in jail together Defendant told him the plan was to kill Miller for owing money for drugs. From Defendant's own testimony at trial it is clear that he induced or encouraged Miller to go to the apartment at Mallard Landing, but according to Defendant this was done so Miller could meet and possibly purchase marijuana from Amezcua, not to assist in the kidnapping or killing of Miller.
There is evidence in this case from which the jury could reasonably conclude that Defendant induced Miller to go to the apartment at Mallard Landing in order to assist in the plan to either kidnap or kill Miller because of money he owed for drugs, and that Defendant acted with prior knowledge of the plan and the requisite intent. It was up to the jury as trier of facts to decide which witnesses to believe and the weight to be given to their testimony. State v. DeHass (1967), 10 Ohio St.2d 230. In reviewing this entire record as a whole we cannot say that the evidence weighs heavily against a conviction, that the jury lost its way, or that a manifest miscarriage of justice has resulted. Defendant's convictions for complicity and conspiracy are not against the manifest weight of the evidence.
The second assignment of error is overruled.
 THIRD ASSIGNMENT OF ERROR COUNTS TWO AND FOUR OF THE INDICTMENT CHARGING THE APPELLANT UNDER THE CONSPIRACY STATUTE ARE FATALLY DEFECTIVE SINCE THEY STATE NO SPECIFIC OVERT ACT IN FURTHERANCE OF THE ALLEGED CONSPIRACY.
Defendant argues that counts two and four of the indictment charging him with conspiracy to commit aggravated murder and murder respectively, are fatally defective and fail to charge an offense because those counts fail to allege what specific, substantial, overt act was committed in furtherance of the conspiracy. See State v. Childs (2000),88 Ohio St.3d 194. Defendant admits that he failed to object to this alleged defect in the indictment during the trial, but he argues that this defect constitutes, "plain error." We do not agree with that contention.
Because Defendant failed to object to this defect in the indictment either before trial or at anytime during the trial before a final judgment was entered, he failed to object in a timely manner pursuant to Crim.R. 12(B)(2). State v. Childs (Sept. 11, 1998), Montgomery App. No. 16325, unreported. Thus, Defendant has waived all but plain error. Accordingly, reversal is warranted only if the outcome of the trial clearly would have been different absent the error. State v. Long (1978), 53 Ohio St.2d 91. In that regard Defendant never claimed that he was unaware of the facts constituting the substantial overt act committed in furtherance of the conspiracy. Moreover, we note that at sentencing the trial court merged counts one through four pursuant to R.C. 2941.25, and imposed a life sentence on count one which charged complicity to commit aggravated murder. Defendant was not sentenced on the conspiracy offenses. Therefore, we cannot conclude that but for this defect in the indictment the outcome of Defendant's trial clearly would have been different. Plain error has not been demonstrated.
The third assignment of error is overruled.
 FOURTH ASSIGNMENT OF ERROR AN INDICTMENT FOR AGGRAVATED MURDER THAT FAILS TO INFORM A DEFENDANT UNDER WHICH SUBSECTION HE IS BEING CHARGED DOES NOT ADEQUATELY PUT HIM ON NOTICE OF THE CHARGE AGAINST WHICH HE MUST DEFEND AND IS FATALLY DEFECTIVE.
Under this alleged error, Bonilla challenges count one of the indictment which provides that Defendant did:
 "[A]cting with the kind of culpability required for the commission of an offense, solicited or procured aided or abetted, and conspired with another to commit the offense of aggravated murder, contrary to and in violation of Section 2923.03 and 2903.01 of the Ohio Revised Code, and against the peace and dignity of the State of Ohio."
Unlike the conspiracy statute (R.C. 2923.01), which was considered under the third assignment of error, the complicity statute (R.C. 2923.03) does not specifically require that the State allege an overt act performed in furtherance of the offense, and further, by way of contrast, the complicity statute specifically provides that a charge of complicity may be stated in the terms of R.C. 2923.03.
Here, the indictment employed the words of the applicable statute, as authorized by Crim.R. 7(B), and the attending reference to the offense of aggravated murder was sufficient to reasonably inform the Defendant of the charge against him. See, State v. Murphy (1992), 65 Ohio St.3d 554; State v. Landrum (1990) 53 Ohio St.3d 107. Unquestionably, the allegations charged an offense and were adequate for indictment by a grand jury, and such allegations apparently gave the Defendant sufficient notice of the alleged crime because a bill of particulars was not requested. See particularly, State v. O'Brien (1987), 30 Ohio St.3d 122.
In the final analysis, the ultimate purpose of the indictment was to inform Bonilla of the crime with which he was charged, and we agree that a pointed reference to a particular subsection of the aggravated murder statute (R.C. 2903.01) would have further refined the specific nature of the offense. However, if this alleged defect was in any way misleading, the Defendant could have raised this defense at anytime before his trial. Crim.R. 12(B)(2). As heretofore indicated, a defect in an indictment, as distinguished from a failure to allege an offense, is subject to correction, but nothing appears from the record in this case to suggest that the Defendant was hampered in any manner in his defense by the form and content of the indictment against him. To be sure, and given that the Defendant raised no issue prior to the trial as to the adequacy of his notice, it cannot be said that "plain error" intervened in these proceedings. See, State v. Long (1978), 53 Ohio St.2d 91 . Hence, the fourth assignment of error is overruled.
 FIFTH ASSIGNMENT OF ERROR COUNTS THREE, FIVE AND SIX OF THE INDICTMENT CHARGING APPELLANT WITH COMPLICITY TO MURDER AND KIDNAPPING ARE FATALLY DEFECTIVE SINCE THEY FAIL TO PROVIDE FAIR NOTICE OF THE CRIMES AGAINST WHICH HE MUST DEFEND.
Defendant argues that counts three, five and six of the indictment are fatally defective because they fail to set forth all of the necessary facts constituting the essential elements of the offenses charged, and thus fail to provide Defendant with adequate notice and an opportunity to defend. Specifically, Defendant complains that these counts fail to identify the name of the victim, thereby making it difficult in a case such as this with multiple victims to ascertain which counts apply to which victims.
Initially, we note that Defendant failed to object either before trial or at anytime during the trial to this defect in the indictment. Crim.R. 12(B)(2). Accordingly, Defendant has waived all but "plain error." The name of the victim is not an essential element of the offenses charged, and thus the failure of the indictment to include that information does not render it legally insufficient. State v. Phillips (1991),77 Ohio App.3d 663; State v. Sabo (Mar. 21, 1998), Athens App. No. 1459, unreported; Crim.R.7(B). Moreover, Defendant could have obtained evidentiary information such as the victim's name via a bill of particulars, which he never requested. We cannot say that but for the failure to include the names of the victims in these counts, Defendant clearly would have been acquitted of these offenses. No error, much less plain error, is demonstrated.
The fifth assignment of error is overruled.
 SIXTH ASSIGNMENT OF ERROR THE TRIAL COURT ERRED IN ADMITTING NON-PROBATIVE EVIDENCE OF PRIOR BAD ACTS AND OF HEARSAY.
Prior to trial Defendant filed a motion in limine seeking to prohibit the State from introducing at trial evidence of "other crimes or acts of wrongdoing" committed by Defendant, specifically his involvement in drug dealing activities. Evid.R. 404. The State responded with a memorandum contra, arguing that Defendant's involvement in the drug trade is admissible because it constitutes part of the immediate background of the alleged acts which form the crimes charged in the indictment, and is inextricably linked to the alleged criminal acts. State v. Lowe (1994),69 Ohio St.3d 527. The trial court agreed with the State and overruled Defendant's motion in limine. Defendant now argues that the trial court erred in admitting evidence of his involvement in the drug trade.
The admission or exclusion of evidence is a matter resting within the trial court's sound discretion and its decision in such matters will not be disturbed on appeal absent a showing that the trial court abused its discretion. State v. Combs (1991), 62 Ohio St.3d 278; State v. Lowe (1994), 69 Ohio St.3d 527. An abuse of discretion connotes more than simply a mere error of law or an error in judgment. It implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. State v. Adams (1980), 62 Ohio St.2d 151.
The State cannot convict an accused of one crime by proving that he or she has committed other crimes, or is a person of bad character. State v. Jamison (1990), 49 Ohio St.3d 182. Pursuant to Evid.R. 404(B) and R.C. 2945.59, evidence of other crimes or acts of wrongdoing by a defendant wholly independent of the crime for which he is on trial is not admissible to prove the Defendant's bad character in order to show that Defendant acted in conformity with that bad character on another specific occasion. Lowe, supra; State v. Curry (1975), 43 Ohio St.2d 66. Evidence of other crimes or acts of wrongdoing may be admissible for other purposes, however, for instance, if they tend to prove one of the matters specifically enumerated in Evid.R. 404(B) and R.C. 2945.59, including motive.
In accordance with its theory of the case, the State presented evidence demonstrating that Defendant's involvement in the drug trade is the very reason why Defendant participated in a plan to kidnap or kill Michael Miller as a way of dealing with the large unpaid drug debt Miller owed as a result of not paying for drugs supplied to him by Defendant and his drug organization. Accordingly, evidence of Defendant's participation in the drug trade was admissible to prove Defendant's motive for participating in a plan to kidnap and/or kill Michael Miller. State v. Hill (1987), 37 Ohio App.3d 72; State v. Matthews (1992),80 Ohio App.3d 409; State v. Myers (Feb. 12, 1999), Greene App. No. 96CA38, unreported. Moreover, the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice. Evid.R. 403(A). The trial court did not abuse its discretion in admitting this evidence.
Defendant also complains about the admission of Tommy Oiler's testimony regarding the conversation Oiler overheard between Defendant and Lopez on the drive back from Chicago to Dayton on October 1, 1998. According to Defendant, Oiler's testimony is hearsay as defined by Evid.R. 801(C) and therefore inadmissible.
Oiler testified on direct examination that during the conversation in question Defendant stated to Lopez, "we get him (referring to Miller) one way or another, if we had to kill him or we'd kidnap him."
Defendant is correct in asserting that the mere fact that a statement is made in the presence of the parties does not mean that the statement is not hearsay or that it is admissible hearsay by virtue of the parties' presence alone. Weissenberger, Ohio Evidence (2000), Section 801.34 at p. 384. However, Evid.R. 801 provides in relevant part:
 (D) Statements which are not hearsay. A statement is not hearsay if:
* * *
 (2) Admission by party-opponent. The statement is offered against a party and is (a) his own statement, in either his individual or a representative capacity, or (b) a statement of which he has manifested his adoption or belief in its truth.
Defendant's statement that he made to Lopez is clearly admissible against Defendant as an admission by a party, pursuant to Evid.R. 801(D)(2)(a). Weissenberger, Ohio Evidence (2000), Section 801.33, pp. 381-382.
On cross-examination when Oiler was testifying about this conversation between Defendant and Lopez, Oiler indicated that it was Lopez who stated to Defendant that they needed to get their money, they would either kidnap or kill him (Miller), one way or another they were going to get their money. Defendant agreed with Lopez and replied: "we are going to have to do what we have to do." This statement by Lopez was made in the presence of the party, Defendant, against whom the statement was offered. Moreover, Defendant expressly adopted and manifested his belief in the truth of the statement by replying: "we are going to have to do what we have to do." Accordingly, Lopez' statement was admissible against Defendant as an adoptive admission pursuant to Evid.R. 801(D)(2)(b). Weissenberger, Ohio Evidence (2000), Section 801.34, pp. 382-384. No abuse of discretion in admitting this evidence has been demonstrated.
The sixth assignment of error is overruled.
 SEVENTH ASSIGNMENT OF ERROR APPELLANT WAS DENIED A FAIR TRIAL DUE TO THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.
A two-part test is used to judge the quality of representation by trial counsel in a criminal case. Strickland v. Washington (1984), 466 U.S. 668. In commenting upon that standard the Ohio Supreme Court in State v. Bradley (1989), 42 Ohio St.3d 136, 142 noted:
 "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, supra, at 687-688, 104 S.Ct. at 2064. The court recognized that there are "* * * countless ways to provide effective assistance in any given case. * * *" Id. at 689, 104 S.Ct. at 2065. Therefore, the court stated that "[j]udicial scrutiny of counsel's performance must be highly deferential. * * *" Id. In addition, "[b]ecause of the difficulties inherent in making the evaluation, a court must [538 N.E.2d 380] indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." Id. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance.
 Even assuming that counsel's performance was ineffective, this is not sufficient to warrant reversal of a conviction. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. Cf. United States v. Morrison, 449 U.S. 361, 364-365 [101 S.Ct. 665, 667-68, 66 L.Ed.2d 564] (1981)." Strickland, supra, 466 U.S. at 691, 104 S.Ct. at 2066. To warrant reversal, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, supra, at 694.
Defendant first complains that his trial counsel performed deficiently by failing to object to certain evidence. For instance, counsel failed to object when the prosecutor during opening statements stated that Defendant's girlfriend, Stephanie Harden, was sixteen years of age when these offenses occurred. Harden was a crucial witness for the State and the opening statements about her were part of the prosecutor's explanation to the jury that Stephanie Harden was one of the witnesses they would be hearing from and her relationship to the Defendant. Opening statements by counsel are not, of course, evidence. State v. Frazier (1995), 73 Ohio St.3d 323. We find nothing improper about the remark. Even assuming purely for the sake of argument that this comment was improper, in view of the evidence presented implicating defendant in these crimes, particularly the testimony by Tommy Oiler, Stephanie Harden and Michael Roberts, we clearly cannot say that there is a reasonable probability that but for counsel's failure to object to this comment, the result of the trial would have been different. No deficient performance or resulting prejudice has been shown.
Defendant next complains because counsel failed to object to testimony by Stephanie Harden that she smoked marijuana with Defendant and had sex with him right after they first met. This testimony explains the circumstances under which Harden first met Defendant and how their relationship developed. Even assuming arguendo that this testimony was improper, in view of the evidence presented implicating Defendant in these crimes, we clearly cannot say that there exists a reasonable probability that but for defense counsel's failure to object to this testimony, the result of this trial would have been different. No prejudice as defined by Strickland has been demonstrated.
Defendant also complains because his counsel failed to object to testimony by Stephanie Harden that Defendant struck her one time when she refused his request to drive one of the people involved in Defendant's drug trade, Waiman Yu, to a location in Fairborn to obtain a gun. This incident occurred just a day or two before the shooting which killed Michael Miller. Once again, assuming purely for the sake of argument that this very limited testimony about Defendant striking Stephanie Harden was improper, in view of the evidence of Defendant's guilt we clearly cannot say that a reasonable probability exists that but for defense counsel's failure to object to this testimony, the result of this trial would have been different. Prejudice as defined by Strickland has not been demonstrated.
Defendant further complains because defense counsel failed to object to Stephanie Harden's testimony that just two days after she met Defendant he was arrested by Dayton police and spent a week in jail before being released on bond. Harden did not identify the charge for which Defendant was arrested. Moreover, in his own testimony at trial, Defendant stated that two days after he met Stephanie Harden he was arrested and spent four days in jail. In addition, Defendant indicated during his testimony that he stopped supplying Michael Miller with drugs after he (Defendant) got arrested in Dayton in June 1998 (which is when he met Harden). Clearly, we cannot say that there is a reasonable probability that had defense counsel objected to Harden's testimony about Defendant being in jail, the outcome of this trial would have been different. No prejudice has been demonstrated.
Defendant additionally complains because his counsel failed to object to the testimony by Sarah Halstead, which Defendant claims was cumulative to the testimony given by her husband, Daniel Halstead. The Halsteads lived in the apartment right next door to where this shooting occurred. They testified about when the shooting took place, the bullets that came through the wall of their apartment, and the events which transpired until police finally removed them from their apartment several hours later. There was nothing improper about their testimony. Defendant has failed to demonstrate that counsel performed deficiently by not objecting to this evidence, much less that Defendant was prejudiced by counsel's performance.
Next, Defendant claims that his counsel performed in a deficient manner because counsel did not file a motion to suppress the statements Defendant made to Crown Point, Indiana police officers. Failure to file a suppression motion does not per se constitute ineffective assistance of counsel. State v. Ford (May 17, 1996), Montgomery App. No. 15374, unreported. Defendant still bears the burden of demonstrating deficient performance and resulting prejudice. Id.
When Defendant and Lopez attempted to leave Amezcua, who was dying from his gunshot wounds, outside in front of the emergency room at St. Anthony's hospital in Crown Point, Indiana, they were immediately confronted and questioned by an off duty deputy sheriff and Crown Point, Indiana police. At that time, when Defendant spoke to Officer Gonzales from the Crown Point, Indiana police, he was not under arrest. When Officer Gonzalez asked what had happened, Defendant stated that a white female they did not know asked them for help at a gas station just down the road, and that they brought the injured man to the hospital as good samaritans in order to get him some help. Defendant and Lopez were subsequently taken into custody and transported to the police station, pending further investigation.
Defendant claims in his appellate brief that he was in custody at the time Crown Point, Indiana police questioned him, and therefore he should have been, but was not, advised of his Miranda rights. The evidence is otherwise. Officer Gonzalez testified that Defendant was not in custody at the time he questioned him at the hospital. There is no contrary evidence. Moreover, although Defendant claims he had difficulty understanding English, Officer Gonzalez testified that he spoke to Defendant in Spanish.
On these facts and circumstances defense counsel may have reasonably decided that attempting to suppress Defendant's statements to Officer Gonzalez would be a futile act, or at least a swearing contest between police and the Defendant. Ford, supra. Without more we cannot say that defense counsel's failure to file a motion to suppress under these circumstances constitutes deficient performance. Id.
Finally, Defendant complains that his counsel performed deficiently by failing to timely object to counts one, two and four of the indictment. Because the trial court merged counts two and four with other counts and did not impose any sentence thereon, we determined that this alleged defect did not constitute "plain error." In other words, we did not find that but for counsel's failure to object to these defective charges, the outcome of this trial clearly would have been different. For the same reason, in assessing the prejudice prong under Strickland which utilizes a test very similar to the plain error test, we likewise cannot say that but for counsel's alleged error in failing to timely object to these defective charges, there is a reasonable probability that the outcome of this trial would have been different. Hence, no prejudice resulting from counsel's alleged deficient performance has been demonstrated.
With respect to count one of the indictment charging Defendant with complicity to commit aggravated murder, which count embraced and alleged all of the elements of complicity, this court has determined, under the fourth assignment of error, that such allegations were sufficient to overcome the prohibition of Section 10, Article I, of the Ohio Constitution, which provides that "no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury." In other words, the name and identity of the crime were unmistakable. See, State v. O'Brien, supra.
After presentment by the grand jury, counsel could have objected to the form of the indictment, but nothing appears from the record to suggest that the failure to object prejudiced the rights of the Defendant or in any way altered the course of the trial. Even assuming that an objection had been made and sustained, the Defendant still would have been vulnerable to the offense of complicity in the commission of an aggravated murder. Hence, there is no reasonable probability that an attack upon the form of the indictment would have produced a different result. Strickland, supra.
Here, the task undertaken by defense counsel was not an easy one, under the existing circumstances, and the Appellant's seventh assignment of error, in all of its parts, must give way to the observations of the Supreme Court of Ohio in State v. Bradley, supra. Accordingly, the alleged error is overruled.
 EIGHTH ASSIGNMENT OF ERROR THE APPELLANT WAS DENIED A FAIR TRIAL DUE TO THE COURT'S DENIAL OF HIS MOTION FOR CHANGE OF VENUE.
Prior to trial Defendant filed a motion seeking a change of venue because of prejudicial pretrial publicity. The trial court took the matter under advisement and deferred any ruling until after voir dire proceedings. The trial court subsequently denied Defendant's motion for a change of venue. Defendant now argues that the trial court committed prejudicial error in overruling his motion for a change of venue because he could not, and did not, get a fair trial due to adverse pretrial publicity. According to Defendant, the adverse publicity created an ethnic stereotype of an Hispanic drug dealing outsider, which resulted in public antagonism towards him.
In State v. Swiger (1966), 5 Ohio St.2d 151, the Ohio Supreme Court stated:
 The examination of jurors on their voir dire affords the best test as to whether prejudice exists in the community against the defendant, and where it appears that opinions as to the guilt of the defendant of those called for examination for jurors are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue, in absence of a clear showing of an abuse of discretion.
Syllabus One. Accord: State v. Montgomery (1991), 61 Ohio St.3d 410.
An examination of the voir dire proceedings reveals that several of the prospective jurors had read or heard something about this case as a result of pretrial publicity. Only one of those jurors indicated that he had already formed an opinion as to guilt that was fixed, and he could not fairly and objectively evaluate the case based solely upon the evidence presented. That juror was excused by the trial court. Nothing in this record even remotely suggests that the remaining prospective jurors were tainted or influenced by the pretrial publicity. To the contrary, this record demonstrates that the impartiality of the members of the jury ultimately selected to serve was not compromised by pretrial publicity. The trial court did not "abuse its discretion" in overruling Defendant's motion for a change of venue. The eighth assignment of error is overruled.
Finding no prejudicial error in the record, and it otherwise appearing that the Appellant received a fair trial, the judgment of the Common Pleas Court will be affirmed.
_______________ KERNS, J. (BY ASSIGNMENT)
WOLFF, P.J. and GRADY, J., concur.
Hon. Joseph D. Kerns, Retired from the Court of Appeals, Second Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.