The STATE of Ohio, Appellee,

v.

MATTHEWS, Appellant.

[Cite as *State v. Matthews* (1992), 80 Ohio App.3d 409.]

Court of Appeals of Ohio,
Cuyahoga County.

Nos. 61139, 60434.

Decided June 1, 1992.

410

*Stephanie Tubbs Jones*, Prosecuting Attorney, for appellee.

*Patrick A. D'Angelo*, for appellant.

PATRICIA A. BLACKMON, Judge.

Appellant, Rasheem Matthews, timely appeals his conviction resulting from a jury trial, for the murder of one Wayne Price. For the reasons set forth below, we affirm.

On or about October 16, 1989, Wayne Price was shot and killed at approximately 2:30 a.m. in the King–Kennedy Housing Projects. Price, his wife, Renee Germany, and a friend named Kenneth Lee rode down to 6200 Scovill Avenue in Cleveland, Ohio. According to Lee's testimony, the purpose of the trip was to purchase some cocaine. When they arrived, Price parked the car just to the right of an alcove or breezeway that lead into a courtyard created by the apartment buildings in the complex.

Apparently, Lee exited the car and proceeded towards the alcove. Renee Germany remained in the car. Price also exited the car but stopped because he encountered an old friend, Theodore Roulette. Although the record was not clear on whether the three men walked through the breezeway into the courtyard together, they all apparently ended up inside the courtyard.

Once inside the courtyard, the men became separated. Lee testified that he lost sight of Price. The testimony of Roulette and Lee indicated that there were between ten and fifteen people in the courtyard, dealing or engaged in drug activity or otherwise standing around.

After some moments elapsed, an egg-throwing incident started. At this point, the testimony of Kenneth Lee and Theodore Roulette varies. Lee had observed Price walk over to a group of seven or eight people before he lost

sight of him. Lee further testified that the courtyard was dark and he did not recognize any of the people present. Lee recalled Price making a statement that "I am a forty-something-year-old man. I don't play these games." Lee's testimony characterized this statement and situation as an argument. He testified that when he saw the argument, he started walking back out of the courtyard. As Lee was about to come out of the courtyard, he heard shots fired behind him. Lee took off running. Lee did not learn of Price's death until a few days later. Interestingly, he did not recall Roulette or the encounter between Roulette and Price. Renee Germany did remember Price greeting somebody presumably Roulette that she did not recognize.

Roulette's testimony was that he entered the King–Kennedy Housing Projects to get some syringes from his ex-wife's roommate. He already had some heroin, which he had a lengthy history of abusing along with cocaine. According to Roulette, he had not used the heroin. On the way out of the complex, Roulette encountered the decedent, Wayne Price, who he testified was an old friend that he had not seen in a number of years. After talking for a short time, according to Roulette, he and Price entered the courtyard to see what was taking Lee so long.

Once inside the courtyard, which Roulette testified was illuminated with lights on one side and shadows on the other, Roulette observed between ten and fifteen people, some buying and selling drugs. Roulette testified that as Price was walking over to see what was keeping Lee, Price was struck by an egg. According to him, the eggs were being thrown from a balcony. Roulette testified that at this point there was some conversation that took place between Appellant and Price. He did not see Price do anything aggressive or violent during the conversation. Price was standing in the dirt area of the courtyard, facing Appellant. At this point, gunshots were fired and Roulette observed Price holding the lower part of his body as he spun around. He also observed Appellant with a gun in his hand. In response to the question on direct examination, "who shot him?" Roulette responded "LAJ." [1] When the shooting took place, Roulette ran from the courtyard through the alcove and left. He likewise did not learn of Price's death until a few days later.

In approximately March 1990, Roulette was arrested and incarcerated in the city of Cleveland jail for theft. While in jail, he encountered a Billy Price, brother of the decedent. Also, in March 1990, Roulette went to the Cleveland Police Department and gave them a complete statement that he had indeed witnessed the murder.

---

**1.** Roulette then identified appellant as "LAJ."

Renee Germany was also called as a witness in the jury trial. She was the decedent's common-law wife. Germany testified that she rode with Price and Lee to the King–Kennedy projects in the early morning hours of October 16, 1989. She testified that upon their arrival, Price and Lee greeted a man that she did not recognize. According to Germany's testimony, Lee proceeded on through the tunnel. Germany could not recall whether the other man, presumably Roulette, entered the tunnel with Price. After about five minutes elapsed, Germany heard gunshots and ducked down inside the car. She remained down in the car until she heard Wayne Price's voice. She peeked out of the car and saw her husband laying in the tunnel with a man standing over him. She heard the decedent say "man, I'm already hit, you don't have to do that." Other than the fact that the person was a man, Germany could not testify as to any of the other details regarding him. The man ran back into the courtyard and then she got out of the car. With the help of someone unidentified, Germany got Price into the car to take him to the hospital. Price was conscious. Germany testified on direct examination that Price said to her "somebody shot me over something silly. Get me to the hospital." On cross-examination, she changed her testimony to reflect that Price said "some silly young nigger shot me."

Charles Paxton also testified for the prosecution. Paxton testified that he was introduced to "LAJ" by two Cuyahoga County Corrections Officers while in jail, who told him to help LAJ out until he got on his feet and that he was a good friend of theirs. When Paxton was introduced to LAJ, he had pleaded to some offenses and was awaiting sentencing.

Paxton testified as to an alleged confession made by appellant. Paxton testified that appellant told him that Wayne Price was not the first guy he had killed in Cleveland. Furthermore, appellant, according to Paxton, told him that he had shot Price twice because he had been bad mouthing him. Appellant also mentioned Price by name according to Paxton. Appellant also told Paxton that he had given drugs to the decedent on credit and the decedent had not paid for them. In addition, appellant allegedly mentioned that a woman named Juanita had witnessed the shooting and if he made bail he would ensure that she would not testify.

Paxton also testified that he had made a lot of phone calls for appellant and tried to arrange a bond on his behalf. In exchange for the bond, appellant assured Paxton that he would do something for him. According to Paxton's testimony, prior to trial, a Francis Barrett also an inmate told him not to testify. Paxton stated that he was offered money not to testify against appellant. He also testified that he had been threatened by both appellant and some corrections officers once it was learned inside the jail that he was

going to be a witness. Paxton testified as well that even though no offers had been made by the state in exchange for his testimony, he came forward because he did not think it was right to kill someone and brag about it.

The defense presented three witnesses, Quanita Muwwakkil, Evelyn Roulette, and Francis Barrett. Muwwakkil testified that even though she had been charged with the murder of Wayne Price, she did not know him and was unfamiliar with appellant but had seen his picture on television. She did not witness a shooting on that night according to her testimony. Evelyn Roulette's testimony essentially discredited her ex-husband. Her testimony was that her ex-husband had never been introduced by her to her roommate, that Roulette had not been to her apartment on the night in question, and that he was a liar who could not see without his glasses. Francis Barrett, who was in Cuyahoga County jail with Paxton, testified to discredit Paxton. He testified that his cell was next to Paxton's and he never saw or heard Paxton being threatened by either appellant or any corrections officers.

On August 3, 1990, a jury found appellant guilty of murder. The trial court sentenced appellant to serve a term of fifteen years to life, consecutive to a three-year term of actual incarceration pursuant to a firearm specification.

In an appeal consolidating two separate cases, appellant asserts four assignments of error that can be efficiently addressed together. They state:

"The verdict is against the weight of the evidence.

"The trial court erred by allowing prejudicial other acts evidence to be introduced to the jury.

"Prosecutorial misconduct throughout the trial and during final argument to the jury denied appellant his Fourteenth Amendment due process right to a fair and impartial trial.

"The trial court erred by denying appellant's motion for new trial."

These four assignments of error raise four central issues germane to this appeal. The first is whether the "other acts" evidence of the statement of implication which is "at least one other killing in Cleveland," appellant's drug involvement, and an alleged bribery attempt were improperly admitted into evidence, resulting in appellant receiving an unfair trial. The second is whether the prosecutor's conduct throughout the trial and during closing argument constituted improper conduct by the prosecutor that was unduly prejudicial to appellant, denying him a fair trial. The third issue is whether appellant's conviction is against the manifest weight of the evidence. The fourth is whether appellant should have been granted a new trial.

With respect to the first issue of the admission of evidence concerning "other acts," Evid.R. 404(B) governs the question of admissibility. It reads:

"Other Crimes, Wrongs or Acts.  Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  (Emphasis added.)

Evid.R. 404(B) expressly provides a limited set of exceptions for admissibility of other acts.  The admissibility of other acts, based on the language in the rule, is controlled by the sound discretion of the trial court.

In the case of *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, the Ohio Supreme Court, in deciding the crucial question of admissibility of other acts to establish an accused's identity of the charged offenses, held that "other acts," *i.e.*, robberies, forming a unique, identifiable plan of criminal activity, are sufficiently probative as to identity to warrant their admission.  To be admissible, these other acts must tend to show by substantial proof "identity" or other enumerated purposes under Evid.R. 404(B).  *Id.* at 183, 552 N.E.2d at 181.  The Ohio Supreme Court went on to state that "although the standard for admissibility is strict, the other acts need not be the same as or similar to the crime charged."  *Id.*

The statement that was allegedly made to Paxton that the decedent was not the first guy he had killed in Cleveland was properly admitted in the trial court's discretion pursuant to Evid.R. 404(B).  This statement is probative evidence of the identity of the decedent's murderer.  It is also evidence of knowledge and an absence of mistake, two of the other stated purposes for which other acts may be admissible.  In considering the balance of probative value versus prejudicial effect, the identity of the killer was a central issue in the case.  Clearly, such a statement allegedly coming from appellant has substantial probative value.  The prejudicial impact is not outweighed by the probative value of this statement largely because it was made by appellant and was a clear admission against interest.  This is true especially since Paxton was rigorously cross-examined by appellant's counsel.

The second other acts evidence complained of was appellant's drug involvement.  The record is replete with evidence that appellant was involved in drugs.  *Jamison, supra,* establishes the proposition that the other acts need not be the same as or similar to the crime charged.  The admission of appellant's drug involvement was inextricably related to this case.  Appellant's statements regarding the decedent having bad mouthed him and the fact that he had given him drugs on credit are all relevant to the stated purpose of motive, intent, identity, and absence of mistake or accident.  The admissibility of these statements is governed by the sound discretion of the trial court and we cannot deem the admission of these statements under the

factual backdrop of this case to be an abuse of discretion. Furthermore, because identity was so crucial to this trial, the probative value of the drug related other acts outweighed any prejudicial impact especially where Paxton was subjected to the rigorous cross-examination of appellant's counsel.

■ The final category of other acts evidence that appellant alleges was improperly admitted was an alleged bribery attempt and intimidation of Paxton. This evidence was properly admitted pursuant to Evid.R. 404(B) as well. It goes to the identity of the murderer. Likewise, it is inextricably related to this offense and was properly admitted when we contemplate both the sound discretion of the trial court and the rigor with which Paxton was cross-examined by counsel for appellant.

The second issue generated by this appeal is whether the conduct of the assistant county prosecutor was tantamount to conduct so improper that it denied appellant a fair trial.

In this case, the prosecution utilized the collateral issues in this trial to their maximum. Undoubtedly, the prosecution argued the collateral issues of drug transactions, the environment of the King–Kennedy Housing Projects, and the obligation imputed on to our society to insure a conviction. The assistant county prosecutor spent a great deal of his time arguing and indicating that no deals or incentives were given to either Roulette or Paxton in exchange for their testimony.

■ This court is constantly called upon to evaluate comments made in closing argument and discern the extent to which they are prejudicial. In the case of *State v. Totty* (Dec. 14, 1983), Cuyahoga App. No. 47152, unreported, 1983 WL 2920, this court enumerated the factors that the reviewing court must consider with respect to whether a fair trial was denied. The reviewing court must consider (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given, and (4) the strength of the evidence against the accused. *Id.*

■ Because of the numerous occasions where the assistant county prosecutor almost, or did, cross the line, the most glaring example will be illustrated. In closing argument, the assistant county prosecutor stated the following:

"The cross-examination of witnesses like Roulette and Paxton saying, well, what happens a year from now or two years from now when nobody else is around, means to suggest to you that we are going to surreptitiously behind your back stand here and tell you one thing and then lie to you; go to somebody else and a say now that the case is over let's give this guy a break.

You know that's not fair really because we live our life as morally as you live yours. We accept your tax money to uphold the public trust."

The irony and tragedy of this statement is the fact that there is ample evidence to suggest that Roulette at least did in fact receive just what the assistant county prosecutor said he would not give him.

At trial, Theodore Roulette denied that he had any kind of a plea agreement with the state regarding his pending cases. Furthermore, the assistant county prosecutor adamantly denied that at the time of trial any kind of an agreement had been made in exchange for his testimony. Unfortunately, the assistant county prosecutor "lives his life as morally as the jurors" and thus we must conclude that the deal was made after the trial. Therefore, the assistant county prosecutor would not have been able to disclose any plea arrangements, as they were not made until after the trial.

The sequence of events subsequent to the trial create a strong inference that Roulette, the sole eyewitness, did receive consideration for his testimony. Despite being indicted for seven felony charges, Roulette was permitted to enter a plea of guilty to three misdemeanors and was placed on probation.

If in fact Roulette received this consideration in exchange for his testimony, these facts should have been disclosed to appellant and his counsel. The problem is compounded when one considers the fact that appellant was not indicted until after Roulette came forward and gave his statement. When this court considers the criteria of *Totty, supra,* the decision is borderline. The scale is only tipped towards affirmance because appellant's counsel on numerous occasions alluded to the fact that consideration was given to both Paxton and Roulette. Counsel for appellant clearly created such an inference for the jury's contemplation with his cross-examinations and closing arguments.

The nature of the remarks by the assistant county prosecutor were at the extreme of the boundaries. The case did involve drugs and a killing. These matters were properly admitted into evidence because they were relevant and helped to provide a backdrop for the incident. Second, this court considers the guideline in *Totty* of whether objections were made by counsel. Appellant's counsel offered timely and vehement objections to the statements of the assistant county prosecutor. The trial court very quickly responded and appropriately admonished counsel with respect to improper commentary. The trial court was quick to point out that it would grant a mistrial if improper commentary in certain areas persisted. Third, even though corrective instructions were not given, the trial court very timely sustained objections posed by the parties and in particular appellant's counsel. Last, *Totty* requires that consideration be given to the strength of the evidence against the accused. The evidence against the accused, in the instant case, was such that a

reasonable mind could conclude that he committed the murder if Paxton and Roulette's testimony is contemplated.

The last consideration enumerated in *Totty* brings us to the third issue in this appeal. At the outset of the opinion, this court expressed its consternation over reaching the conclusion to affirm. It was indeed a difficult decision.

However, when contemplating the third and fourth issues of whether appellant's conviction was against the manifest weight of the evidence and whether appellant should have been granted a new trial, this court is obligated to go back to the testimony of Roulette and Paxton. Their credibility was at the heart of this conviction. The second item that has to be considered with respect to the question of a fair trial is the commentary and conduct of the assistant county prosecutor.

With respect to the two witnesses, this is a case of the skill of counsel on cross-examination vitiating any alleged error. Counsel for appellant argues that the failure to disclose the deals given to the prosecution's witnesses in exchange for their testimony was unduly prejudicial. However, the record amply reflects that counsel for appellant pursued this point zealously during both cross-examination and closing argument. Any alleged error was more than adequately countered by the cross-examination and closing argument of counsel for appellant.

■ There are two very key pieces of evidence that this court believes tips the scales toward a conviction not being against the manifest weight of the evidence. The first is that Paxton testified that appellant told him that he shot Wayne Price twice. The autopsy protocol reflects that appellant was indeed shot *twice*. In contradiction of appellant's theory that Paxton could have gotten his information from the media, the number of times the decedent was shot is probably not a fact reported in media accounts. Indeed it could be, but it is in the opinion of this court extremely probable that Paxton would not know such a detail unless appellant told him. The second is Paxton's knowledge of a "Juanita" and the fact that she was a witness to the shooting. The media accounts, on this issue, if any probably would have portrayed her as the killer since she was initially indicted for the murder and was not a witness. The fact that Paxton would also know that "Juanita" was involved is also an extremely probative fact in this court's opinion.

■ In affirming and analyzing our decision, the consternation of this court arises from the fact that but for such skillful cross-examination and closing argument of counsel for appellant designed to rebut the "convict the menace to society" argument of the assistant county prosecutor, this case may have come out differently in the evaluation of undue prejudice and we may have

deemed appellant's motion for a new trial well founded.  However, the skill of appellant's counsel and the handling of this case by the trial court ameliorated the potential prejudice to appellant.

It is a sad commentary on our criminal justice system to even think that deals are made with witnesses and not disclosed;  that assistant county prosecutors are permitted to represent to the trial court that no deals with witnesses have been made, knowing that after the trial the deal will be made;  that police have fifteen potential witnesses in an urban housing project and none can be located;  that the one factor that separated appellant from an unfair trial is the ability to hire a superlative defense attorney as well as a trial judge of sound legal acumen, both of whom vitiated any undue prejudice in this case.

*Judgment affirmed.*

SPELLACY, P.J., concurs.

JAMES D. SWEENEY, J., dissents.

JAMES D. SWEENEY, Judge, dissenting.

I respectfully dissent.

The adamant denial by the prosecutor that at the time of trial any kind of an agreement had been made in exchange for Theodore Roulette's testimony causes the majority, and this writer, great concern.  The record is clear, and the majority correctly recognizes, that at least as to Roulette (the sole eyewitness to the shooting), an understanding between the state and the witness had been reached at the time of this trial regarding Roulette's present testimony and considerations to be extended by the state on his behalf in sentencing on a pending unrelated multiple felony case.  This denial of the existence of a *quid pro quo* situation effectively prevented defendant's counsel a proper cross-examination on the matter which directly impacts the weight to be afforded Roulette's testimony.  See, generally, *State v. Wolery* (1976) 46 Ohio St.2d 316, 75 O.O.2d 366, 348 N.E.2d 351; *State v. Aldridge* (1981), 3 Ohio App.3d 74, 78, 3 OBR 86, 89, 443 N.E.2d 1026, 1030.  Had the jury been actually aware of the understanding/consideration given to Roulette, rather than having to garner such information in a circuitous fashion through the inferences and allusions of defense counsel, the outcome of the trial is brought into serious question.  With actual knowledge of an understanding, the jury could have given less weight to the testimony of Roulette, and possibly Paxton's testimony as well.  For these reasons, I would reverse and remand for a new trial.