*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0156p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

RASHEEM MATTHEWS,

*Petitioner-Appellee,*

*v.*

No. 06-3451

TODD ISHEE,

*Respondent-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-02049—John R. Adams, District Judge.

Argued: March 14, 2007

Decided and Filed: May 4, 2007

Before: NORRIS, GILMAN, and McKEAGUE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Jerri L. Fosnaught, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellant. J. Dean Carro, UNIVERSITY OF AKRON SCHOOL OF LAW, Akron, Ohio, for Appellee. **ON BRIEF:** Jerri L. Fosnaught, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellant. J. Dean Carro, UNIVERSITY OF AKRON SCHOOL OF LAW, Akron, Ohio, for Appellee.

---

**OPINION**

---

McKEAGUE, Circuit Judge. An Ohio jury convicted Rasheem Matthews of the murder of Wayne Price. An eyewitness and a jailhouse informant testified for the prosecution. Approximately two weeks after Matthews's conviction and sentence, both witnesses received favorable plea bargains. According to Matthews, the witnesses had agreed to testify in exchange for these favorable pleas, and, therefore, the prosecution should have notified the defense of the preexisting deals. Because it failed to do so, Matthews argues that the prosecution violated his right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963). The district court agreed and granted Matthews a conditional writ of habeas corpus.

As explained *infra*, Matthews procedurally defaulted his claim involving the jailhouse informant, and has failed to show cause for the default. On his claim involving the eyewitness, the state court concluded that there was no preexisting deal, and Matthews has not rebutted this factual finding with clear and convincing evidence. Accordingly, we reverse.

## I

The magistrate judge's report and recommendation and the district court judge's opinion set out the facts of this case in sufficient detail. We note only those facts relevant to this appeal.

A Cuyahoga County grand jury indicted Matthews in 1990 for unlawfully and purposely causing the death of Price and for a firearm specification. The murder occurred in the early morning hours of October 16, 1989, when Price was shot and killed at the King-Kennedy Housing Projects in connection with a drug purchase. Theodore Roulette testified that he spoke to Price at the projects. A few moments later, according to Roulette, he saw Price facing Matthews, heard gunshots fired and observed Price holding the lower part of his body as he spun around. Roulette also testified that he observed Matthews with a gun in his hand. Price bled to death from two gunshot wounds.

In March 1990, Roulette was incarcerated in the Cleveland City Jail for theft, where he encountered Price's brother. After this encounter, Roulette went to the Cleveland Police Department and gave a statement that he had witnessed the shooting and named Matthews as the shooter. Matthews was subsequently arrested.

During Matthews's trial, the prosecution, led by Assistant Prosecutor Carmen Marino, also presented the testimony of Charles Paxton, a jailhouse informant. Paxton testified that he was introduced to Matthews by corrections officers while in jail. Paxton stated that Matthews had confessed to him that he shot Price two times because Price had been bad-mouthing him. Matthews purportedly told him that Price was not the first man he had killed in Cleveland. Paxton also testified that Matthews told him that he had given drugs to Price on credit, but had not been paid.

Both Roulette and Paxton claimed that they received no consideration for their testimony. Roulette testified that he had not entered a plea to charges pending against him and he was probably going back to prison. Roulette's purported reason for testifying was his friendship with Price and being a good citizen. Paxton testified that he had been told by another inmate not to testify, had been offered money not to testify, and had been threatened by both Matthews and some corrections officers once it was learned inside the jail that he was going to be a witness at the trial. Paxton claimed that he came forward because he did not think it was right to kill someone and brag about it.

In addition to attacking the credibility of Roulette and Paxton, Matthews offered the testimony of several witnesses. Evelyn Roulette, Roulette's wife, testified that Roulette had not been in her apartment that evening as he claimed, was a liar, and could not see without his glasses. Francis Barrett, the man Paxton claimed told him not to testify, stated that his cell was next to Paxton's and he never saw or heard Paxton being threatened by Matthews or any correction officers. Matthews also offered the testimony of a Quanita Muwwakkil, who originally had also been charged with Price's murder. Muwwakkil testified that she did not know Price or Matthews nor did she witness any shooting on the evening in question.

During his closing, Assistant Prosecutor Marino addressed defense counsel's argument that the two witnesses did have deals for leniency, notwithstanding their testimony to the contrary:

> The cross-examination of witnesses like Roulette and Paxton saying, well, what happens a year from now when nobody else is around, means to suggest to you that we are going to surreptitiously behind your back stand here and tell you one thing and then lie to you; go to somebody else and a say now that the case is over let's give this guy a break. You know that's not fair really because we live our life as morally as you live yours. We accept your tax money to uphold the public trust.

*State v. Matthews*, 609 N.E.2d 574, 579 (Ohio Ct. App. 1992) (quoting from the trial transcript).

Matthews's first trial ended in a mistrial when the jury was unable to reach a verdict. A second trial began on August 3, 1990, which resulted in conviction. Three days after the conviction, the trial court sentenced Matthews to imprisonment of fifteen years to life on the murder charge and three years on the firearm specification, to be served consecutively.

Before Matthews's trial, Roulette had been indicted on seven felony charges, unrelated to the above action, in three separate cases for forgery, uttering, grand theft of a motor vehicle, theft with a violence specification, and breaking and entering. On August 16, 1990, ten days after Matthews was sentenced, Roulette pleaded guilty to lesser included misdemeanors in all three cases, with the approval of Assistant Prosecutor Marino. During the plea proceedings, Roulette's attorney stated:

> The court is well familiar with the facts leading up to this plea bargaining today. Your honor, I would just point out that through extensive discussions with Mr. Marino in the major trial division and the Cuyahoga County Prosecutor's Office and Detective Qualey of the Cleveland Police Homicide Unit, it's my understanding that without the testimony of my client, the convicted murderer known as LAJ [Matthews] would not be behind bars today. It's my client's testimony that put him behind bars.
>
> Nothing can excuse Mr. Roulette's prior criminal history or criminal behavior, but one thing remains a fact is that he has risked his own life, the life of his wife, who is in the courtroom today, and the safety of his family so that this murderer was brought to trial and convicted and is currently serving his time. We would ask the Court's consideration and also ask for an immediate sentencing taking into consideration of the foregoing factors.

Roulette received a suspended sentence of six months of incarceration and five years of probation. The court had the following exchange with Roulette:

> THE COURT: Let me make one thing real clear. While you benefitted from the plea bargain presently before this Court is well known to you, it is well known to the prosecutor's office and it is well known to the defense counsel and it's well known to this Court, but you come back here with a dirty urine, you come back here not having paid this fine—or these court costs and that restitution in equal monthly installments, I'm going to put you in jail; you understand me?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Do you have any questions whatsoever?
>
> THE DEFENDANT: Quite clear.
>
> THE COURT: You drop off the straight and narrow, Mr. Roulette, and you're gone, no matter what happens.
>
> THE DEFENDANT: Thank you, your Honor.
>
> THE COURT: We understand each other?
>
> THE DEFENDANT: Quite Clear.

THE COURT: Fine.

When Paxton met Matthews in the county jail, Paxton had already pleaded guilty to separate charges of theft and extortion, third-degree felonies. On May 21, 1990, prior to Matthews's trial, Paxton was sentenced to one year in prison in the first case and eighteen months in prison on the second case. The sentences were to run concurrently.

On August 16, 1990, Paxton's attorney filed a motion to withdraw the guilty pleas in the two cases. He argued that Paxton was not properly advised that his guilty pleas would make him a parole violator, thus causing the sentences to be served consecutive to what the parole board imposed. However, in both Paxton's plea hearing and his sentencing, the court explained that the guilty pleas could be a violation of his parole.

A hearing was held the following day. Assistant Prosecutor Marino appeared on behalf of the prosecution, although he had not been involved in Paxton's cases prior to that time, and made no objection to the motion. The assistant prosecutor offered amended indictments to the court, one for petty theft and one for coercion, both misdemeanors. Paxton pleaded guilty to both charges. Before resentencing, Paxton's attorney stated, "Your honor, Paxton entered guilty pleas to the offenses on May 2, 1990. I would just like the Court to take into account the cooperation that Mr. Paxton has shown to the State before it imposes its sentence." The court gave Paxton a suspended sentence of six months and ninety days, respectively, to be served concurrently, and five years probation. The court went on to note: "Let me make one thing very, very clear to you. You know, the prosecutor knows, defense counsel knows, and the Court knows why this plea bargain has been worked out."

## II

Matthews appealed his conviction. He raised several claims, including prosecutorial misconduct based in part on the failure of the assistant prosecutor to disclose an alleged deal between him and Roulette before trial. On this claim, the Ohio Court of Appeals affirmed, but not without reservation:

> At trial, Theodore Roulette denied that he had any kind of a plea agreement with the state regarding his pending cases. Furthermore, the assistant county prosecutor adamantly denied that at the time of trial any kind of an agreement had been made in exchange for his testimony. Unfortunately, the assistant county prosecutor "lives his life as morally as the jurors" and thus we must conclude that the deal was made after the trial. Therefore, the assistant county prosecutor would not have been able to disclose any plea arrangements, as they were not made until after the trial.

> The sequence of events subsequent to the trial create a strong inference that Roulette, the sole eyewitness, did receive consideration for his testimony. Despite being indicted for seven felony charges, Roulette was permitted to enter a plea of guilty to three misdemeanors and was placed on probation.

> If in fact Roulette received this consideration in exchange for his testimony, these facts should have been disclosed to appellant and his counsel. The problem is compounded when one considers the fact that appellant was not indicted until after Roulette came forward and gave his statement. When this court considers the criteria of *Totty*, *supra*, the decision is borderline. The scale is only tipped towards affirmance because appellant's counsel on numerous occasions alluded to the fact that consideration was given to both Paxton and Roulette. Counsel for appellant

clearly created such an inference for the jury's contemplation with his cross-examinations and closing arguments.

*Matthews*, 609 N.E.2d at 579. One judge dissented, writing in part:

> The adamant denial by the prosecutor that at the time of trial any kind of an agreement had been made in exchange for Theodore Roulette's testimony causes the majority, and this writer, great concern. The record is clear, and the majority correctly recognizes, that at least as to Roulette (the sole eyewitness to the shooting), an understanding between the state and the witness had been reached at the time of this trial regarding Roulette's present testimony and considerations to be extended by the state on his behalf in sentencing on a pending unrelated multiple felony case. This denial of the existence of a *quid pro quo* situation effectively prevented defendant's counsel a proper cross-examination on the matter which directly impacts the weight to be afforded Roulette's testimony.

*Id.* at 580 (Sweeney, J., dissenting). The Supreme Court of Ohio dismissed Matthews's petition for review.

Matthews then attacked his conviction on collateral review. He filed with the state trial court a "Motion for Order Finding that Defendant was Unavoidably Prevented from Discovering Evidence." In support of his motion, Matthews submitted the deposition testimony of Roulette, stating that he: (a) recanted his prior trial testimony; (b) denied that he was a witness to the crime; (c) had lied under oath at trial; and (d) had made a deal with the prosecutor prior to testifying. The trial court denied the motion and no appeal was taken from the ruling.

In 1995, after discovering that Paxton had withdrawn his previously entered guilty plea after trial, Matthews filed another motion for a new trial. The basis for the motion was an alleged preexisting plea agreement with Paxton and a claim of ineffective assistance of counsel. The trial court held an evidentiary hearing. Assistant Prosecutor Marino testified that no deals were made with the witnesses prior to or during trial. He explained that he supported the subsequent pleas and sentences for several reasons, including the witnesses' cooperation in testifying for the prosecution and a concern for their safety if they were to be imprisoned with Matthews. The judge who accepted the pleas and sentenced both witnesses also testified. He was aware that they received consideration in the form of reduced charges for their testimony, but had no knowledge of any preexisting agreements.

The trial court concluded there was sufficient evidence to show Roulette and Paxton had preexisting deals, and granted the motion for a new trial. On appeal, however, the Ohio Court of Appeals reversed, finding that Matthews failed to comply with the deadline for bringing a motion for new trial under Ohio Rule of Criminal Procedure 33.

Matthews then filed a petition for a writ of habeas corpus in federal district court, raising a single claim of prosecutorial misconduct under *Brady*. The district court referred the matter to a federal magistrate judge for report and recommendation. The magistrate judge determined that Matthews had procedurally defaulted his claim involving Paxton under Rule 33. As for the claim involving Roulette, the magistrate judge found that there was no preexisting deal between Roulette and the prosecution. In so finding, the magistrate judge relied on the purported factual finding by the Ohio Court of Appeals to that effect. The magistrate judge concluded that Matthews had not been denied any due process under *Brady*.

The district court disagreed. It found that Matthews had cause for defaulting his Paxton claim, and had suffered prejudice as a result. It further found that the assistant prosecutor had deals with both Paxton and Roulette before their testimony, based on its own, different interpretation of

the state court's factual finding. Concluding that the assistant prosecutor violated *Brady* by failing to inform the defense of the deals before trial, the district court conditionally granted habeas relief to Matthews, giving the State of Ohio 120 days to retry him for Price's murder or to release him (subject to any incarceration for other crimes).

The Warden timely appealed.

### III

Matthews raises claims of prosecutorial misconduct related to the testimony of Roulette and Paxton. He argues that both witnesses had preexisting deals with the prosecution for reduced charges and sentences in exchange for their testimony. If true, the prosecution had a duty to notify Matthews's counsel of these deals and correct the witnesses' contrary testimony; its failure to do so would have resulted in a denial of due process under *Brady*, 373 U.S. at 87, and *Giglio v. United States*, 405 U.S. 150, 153 (1972).

### A.    *Standard of Review*

In a habeas case, we review a district court's legal conclusions *de novo*. *Miller v. Webb*, 385 F.3d 666, 671 (6th Cir. 2004). As for a district court's findings of fact, we usually review these findings for clear error, but when that court's "decision in a habeas case is based on a transcript from the petitioner's state court trial, and the district court thus makes no credibility determination or other apparent findings of fact, the district court's factual findings are reviewed *de novo*." *Id.* (internal quotation marks omitted).

With the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress has provided courts with the following standards governing a petition for habeas corpus relief:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254. A state court decision involves "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" only if it is shown that the state court's presumptively correct factual findings are rebutted by "clear and convincing evidence" and do not have support in the record. *Id*. § 2254(e)(1). The presumption of correctness also applies to factual findings made by a state appellate court based on the trial record. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981).

### B.    *Matthews's Claim Involving Paxton*

In general, a federal court may not consider an issue of federal law arising from a judgment of a "state court if that judgment rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the [state] court's decision." *Harris v. Reed*, 489 U.S. 255, 260 (1989). A federal court typically will not reach the merits of a claim when a state

court has already rejected that claim for procedural reasons—i.e., the petitioner has "procedurally defaulted" the claim in state court. *Id*. at 261.  When a petitioner procedurally defaults a claim, the petitioner cannot receive habeas relief in federal court unless the petitioner can show either cause for the default and actual prejudice from the alleged violation of federal law, or establish that the "failure to consider [federal] claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991).

As Matthews readily concedes, there is no question he procedurally defaulted his claim involving Paxton.  In his final motion for a new trial in state court, Matthews argued that the prosecution failed to notify him that Paxton received consideration for his testimony, as evidenced by the withdrawal of his guilty plea, the plea to reduced charges, and the re-sentencing.  Although the trial court granted the motion, the Court of Appeals of Ohio reversed, holding that Ohio Rule of Criminal Procedure 33 barred his claim. *Ohio v. Matthews*, No. 70587, slip op. at 9 (Ohio Ct. App. Mar. 22, 1999).  Rule 33 provides, in part, a motion for a new trial based on newly discovered evidence

> shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived.  If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

Ohio R. Crim P. 33(B).  Defense counsel had discovered Roulette's plea bargain, but did not check the public records to determine whether Paxton had received a similar bargain. *Matthews*, No. 70587, slip op. at 8.  Because of this, the state court concluded that Matthews did not exercise reasonable diligence in discovering the existence of Paxton's deal. *Id.* at 8-9.

Matthews argues, however, that he can show both cause and prejudice for his default.[1]  The district court agreed, determining that the prosecutor impeded Matthews from finding out about Paxton's plea bargain by repeatedly assuring the jury that no pleas had been or would be made with either Paxton or Roulette, and then not informing Matthews of the Paxton plea bargain during his direct appeal.  The district court did not fault Matthews for failing to find out about Paxton's plea bargain because, under *Strickler v. Greene*, 527 U.S. 263, 284 (1999), defense counsel could rely on the statements made by the assistant prosecutor.

The district court erred.  Two important considerations distinguish this case from *Strickler* and some other prosecutorial-misconduct cases.  First, Paxton's withdrawal of his original guilty plea, plea to reduced charges, and re-sentencing were all public information.  Contrast this case with those cases when the government has sole possession of investigative notes or memoranda; in such cases, the government has a duty to provide the information to the defense. *See, e.g.*, *Banks v. Dretke*, 540 U.S. 668, 696-97 (2004) (rejecting the state's argument that the petitioner could have discovered exculpatory facts with sufficient investigation; the facts were not available in an easily accessible public forum); *Strickler*, 527 U.S. at 285 (rejecting the state's argument that the petitioner should have known about the existence of investigative records and notes, even though the documents were not in the prosecutor's "open file").  Where, like here, "the factual basis for a claim" is "reasonably available to" the petitioner or his counsel from another source, the government is under no duty to supply that information to the defense. *Strickler*, 527 U.S. at 283 n.24 (quoting

---

[1] Matthews does not argue that failure to consider his claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749.

*Murray*, 477 U.S. at 488). In other words, when the information is readily available to the defense from another source, there simply is nothing for the government to "disclose." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).

Second, Matthews knew that Roulette had pled to misdemeanor offenses with a suspended prison sentence, even though the assistant prosecutor had made comments during trial that Roulette did not have a deal in exchange for his testimony. Thus, Matthews's suspicion should have been piqued that Paxton may have received a new plea bargain similar to Roulette's, notwithstanding the assistant prosecutor's comments. The discovery of Roulette's plea bargain would have put a reasonable person on notice to a similar arrangement with Paxton, regardless of whether or not motions to withdraw a plea after sentencing are rarely successful in Ohio, as suggested by Matthews. Had he inquired as to Paxton like he did as to Roulette, Matthews surely would have discovered the new plea bargain, given Paxton entered his new plea and was sentenced within a day of Roulette's plea and sentencing. Matthews's failure to check the public records after being put on notice was his own failure, and not a failure caused by the assistant prosecutor or some other external factor. *Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir. 2004) (finding no *Brady* violation where defendant was "on notice" that evidence existed and "[a] reasonable defendant would have pursued that inquiry"); *United States v. Corrado*, 227 F.3d 528, 538 (6th Cir. 2000) (rejecting a *Brady* claim where the defendant "has made no showing that he would have been unable to identify, locate, and interview these individuals through reasonable efforts on his own part"). Thus, Matthews has failed to establish cause for his procedural default.

The cause-and-prejudice analysis is a conjunctive one, requiring a petitioner to satisfy both prongs to excuse a procedural default. Because Matthews has not shown cause, we will not address whether he has satisfied the prejudice prong. *Broom v. Mitchell*, 441 F.3d 392, 405 (6th Cir. 2006) ("As Broom has not shown the requisite cause to excuse the procedural default of this claim, we will not examine whether he has shown the requisite prejudice, nor will we proceed to the merits of Broom's *Brady* claim."). Accordingly, Matthews has procedurally defaulted his *Brady* claim involving Paxton.

## C.      *Matthews's Claim Involving Roulette*

Both parties agree Matthews did not procedurally default his *Brady* claim involving Roulette. He raised the claim on direct appeal before the Court of Appeals of Ohio. While that court denied his appeal, it did so not under federal law, but rather on the basis of an Ohio state court decision, *State v. Totty*, No. 47152, 1983 WL 2920 (Ohio Ct. App. Dec. 15, 1983), which did not rely upon federal due-process concerns (e.g., *Brady* or its progeny). Thus, as Matthews's *Brady* claim was fairly presented but not reviewed on the merits by a state court, we review the claim *de novo*,[2] but with one important caveat: the state court did make a factual finding that plays a crucial role in the Roulette claim. We must accept this finding of fact unless it is rebutted by clear and convincing

---

[2] *Lyell v. Renico*, 470 F.3d 1177, 1182 (6th Cir. 2006) ("If the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply and we conduct our review *de novo*." (internal quotation marks, brackets, and citations omitted)); *Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006) (same); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003) (same); *but see Slaughter v. Parker*, 450 F.3d 224, 232 (6th Cir. 2005) ("In the absence of a state court decision on the federal constitutional case in question, the court of appeals conducts a review to determine whether the state court decision is contrary to Supreme Court jurisprudence." (citing *Clifford v. Chandler*, 333 F.3d 724, 730 (6th Cir. 2003), *overruled in part by Wiggins v. Smith*, 539 U.S. 510 (2003)).

evidence. 28 U.S.C. § 2254(e)(1). What exactly the finding is, however, has been a matter of considerable dispute in this litigation.[3]

In his report and recommendation, the magistrate judge determined that the Court of Appeals of Ohio found that there was no preexisting deal between the prosecution and Roulette:

> The court [of appeals] concluded that the "sequence of events subsequent to the trial created a strong inference that Roulette, the sole eyewitness, did receive consideration for his testimony." However, "we must conclude that the deal was made after the trial. Therefore, the assistant county prosecutor would not have been able to disclose any plea agreements, as they were not made until after the trial." Thus, there was no prosecutorial misconduct under *Totty*.

*Matthews v. Ishee*, No. 01-2049, R&R at 3 (N.D. Ohio Jan. 24, 2003). The magistrate judge proceeded to note that the Court of Appeals' subsequent statements, including it was a "'sad commentary . . . to even think that deals are made with witnesses and not disclosed[,]' . . . are not findings of fact." *Id.* at 3-4. The magistrate judge concluded "[w]hile Matthews has certainly presented evidence that raises a suspicion [of a preexisting deal] . . . this is not clear and convincing evidence to overcome the finding of the Ohio Court of Appeals." *Id.* at 10.

Upon *de novo* review of the magistrate judge's report and recommendation, the district court came to the opposite conclusion on the factual finding made by the state court. After reviewing the portion of the majority opinion quoted in Section II, *supra*, the district court reasoned:

> The Court notes that this portion of the appellate decision is quite confusing by first stating that the court found no deal was made prior to trial but then finding the subsequent events create a strong inference that Roulette did receive consideration for his testimony and finally ending with the conclusion that if consideration was received in exchange for his testimony, it should have been disclosed to Matthews and his counsel. The dissent, perhaps, lends some guidance as to what is being said by the majority:
>
>> The record is clear, **and the majority correctly recognizes**, that at least as to Roulette (the sole eyewitness to the shooting), an understanding between the state and the witness had been reached at the time of this trial regarding Roulette's present testimony and considerations to be extended by the state on his behalf in sentencing on a pending unrelated multiple felony case.
>
> If the opinion is read in total, it appears that the appellate court did determine that a deal existed between Roulette and the prosecution at the time of Matthews's trial but found that under *Totty*, Matthews received a fair trial. . . . It is . . . noted that the appellate court's finding of fact that a deal was reached with Roulette prior to trial is presumed to be correct under § 2254(e)(1) absent a showing of clear and convincing evidence.

*Matthews v. Ishee*, 414 F. Supp. 2d 792, 807-08 (N.D. Ohio 2006) (emphasis in original; citations

---

[3] The Warden argues that the Ohio Court of Appeals actually addressed both the legal and factual grounds for Matthews's Roulette claim, and, therefore, we should apply a deferential standard of review, rather than *de novo*. While correct as to the factual question of whether there was a preexisting deal between the assistant prosecutor and Roulette, *see infra*, it is clear from a review of the state court's opinion that it did not consider the prosecutorial misconduct claim through the lens of *Brady*.

omitted). Thus, looking at the same opinion, the magistrate judge and the district court arrived at opposite conclusions on the finding of fact actually made by the state court.

It is perhaps not surprising the state court's opinion has caused some interpretive problems. On the one hand, there is the plain reading of the majority's statement: "[W]e must conclude that the deal was made after the trial. Therefore, the assistant county prosecutor would not have been able to disclose any plea agreements, as they were not made until after the trial." *Matthews*, 609 N.E.2d at 579. On the other hand, there is the subsequent discussion by the majority, including its determination that "[t]he sequence of events . . . create a strong inference that Roulette . . . did receive consideration for his testimony." *Id.* There is also the dissent's gloss on what the majority meant. Finally, there is the possibility the majority was simply being sarcastic when it stated "[*u*]*fortunately*, the assistant county prosecutor 'lives his life as morally as the jurors' and thus we must conclude that the deal was made after the trial." *Id*. (emphasis added). A close reading, however, undercuts this possibility.

While the majority exhibited obvious displeasure with the assistant prosecutor, it analyzed his statements regarding Roulette through two prisms, one based on the record evidence and one grounded in the law. First, the majority pointed out that Roulette testified at trial that there was no plea agreement between him and the prosecution. *Id*. Roulette's testimony, while challenged by defense counsel, went unrebutted at trial by any contrary testimony or other evidence. Second, when it considered the assistant prosecutor's denial before the jury of any preexisting deal, the majority did so through the general presumption that prosecutors, like citizens in general, can be taken at their word. *See, e.g.*, *Widmeyer v. Felton*, 95 F. 926, 929 (C.C.S.D. Ohio 1899) ("The law presumes that men will speak the truth; that they will act honestly and will obey the law. These are necessary presumptions."); *State v. Patterson*, 277 N.E.2d 201, 203 (Ohio 1971) ("In oral argument before this court, the prosecutor was asked, on his professional honor, if he knew of any evidence favorable to the appellant that had been concealed. He answered in the negative. . . . [N]o more than this could have been done by the trial court to satisfy *Brady*."). Given both the unrebutted testimony and the general presumption of truthfulness, the majority found it "must conclude that the deal was made after the trial." *Matthews*, 609 N.E.2d at 579. This is a clear and plain statement.

Importantly, the majority's subsequent discussion does not contradict this clear and plain statement. At various parts of the opinion the majority pointed to evidence "creat[ing] a strong inference that Roulette . . . did receive consideration for his testimony," and "that there is ample evidence to suggest that Roulette" received such consideration. *Id*. But, the majority did not find conclusively that the consideration was made in exchange for Roulette's testimony before he actually testified. At one point the majority explained "[*i*]*f in fact* Roulette received this consideration in exchange for his testimony, these facts should have been disclosed to [Matthews] and his counsel," *id.* (emphasis added), and then concluded:

> It is a sad commentary on our criminal justice system *to even think* that deals are made with witnesses and not disclosed; assistant county prosecutors are permitted to represent to the trial court that no deals with witnesses have been have been made, knowing that after the trial the deal will be made; . . . .

*Id.* at 580 (emphasis added). As these statements make clear, the majority found the assistant prosecutor's actions during and after trial troubling, but not so troubling as to compel a finding of a preexisting deal with Roulette.

In the dissenting judge's view, however, the majority did conclude that there was a preexisting "understanding between the State and the witness." *Id.* (Sweeney, J., dissenting). Of course, the dissenting judge's view has no precedential effect (as it failed to garner a majority); its effect is measured only by its persuasiveness. As explained above, the dissenting judge's view of

what the majority understood does not comport with the explicit finding made by the majority, nor with the majority's subsequent use of noncommittal language, such as "if in fact" and "to even think." The district court erred in relying upon the dissenting judge's gloss, especially when that gloss directly contravened the majority's clear and plain finding.

Matthews argues, however, that the majority's seemingly clear and plain factual finding was not a finding at all, but rather sarcasm, as evidenced by its statement that "Unfortunately, the assistant county prosecutor 'lives his life as morally as the jurors' . . . ." This statement is replete with sarcasm, according to Matthews. While not wholly implausible, his suggested reading suffers from one fundamental defect: it never lets the cat out of the bag, so to speak. In general, sarcasm is notoriously difficult to express in writing because it "is vocally oriented" and "is easily misinterpreted" "in written form." Wikipedia, Sarcasm, at http://en.wikipedia.org/wiki/Sarcasm (last visited March 23, 2007).[4] Had the majority intended to be sarcastic, one would have expected it to be more careful to alert readers at some point that regardless of what it said—"we must conclude that the deal was made after the trial"—it was actually holding the exact opposite—the deal was made before or during the trial. Nowhere in its opinion does the majority make the latter finding in clear and express terms.

The more natural and consistent reading is the one made by the magistrate judge. Rather than an attempt at sarcasm, the majority's use of the term "unfortunate" is a sign of sincere resignation on its part that the unrebutted testimony and presumption of truthfulness have compelled it to find there was no preexisting deal, regardless of its suspicions to the contrary. As sincere resignation, the majority's language is fully consistent with its subsequent discussion; as sarcasm, its language leaves unresolved (or at the very least quite muddled) one of the crucial factual issues raised by Matthews. Because the former reading is internally consistent and gives full effect to the entire opinion, we accept that reading and reject Matthews's and the district court's alternate reading.

Accordingly, we hold that the majority's statement "the deal was made after the trial" is a factual finding made by the state court. Under AEDPA, we are bound by this finding unless Matthews can rebut it with clear and convincing evidence to the contrary.

## D.     *Matthews's Evidence of a Preexisting Deal*

Apart from the state court's factual finding, Matthews argues that there is overwhelming evidence of a preexisting deal between the prosecution and Roulette. He cites the temporal proximity between his conviction and sentence and Roulette's plea; the assistant prosecutor's involvement in the plea; and the sentencing judge's comments to Roulette during the hearing. Moreover, although not highlighted by Matthews, there is also evidence in the record that Roulette recanted his trial testimony.

In a prior case, this court rejected a similar argument made by a habeas petitioner. In *Williams v. Coyle*, the petitioner asserted that deals "to exchange lighter sentences for testimony against [him] existed between the prosecution" and two witnesses. 260 F.3d 684, 707 (6th Cir. 2001). The prosecution's failure to disclose these deals violated *Brady*, according to the petitioner. In support, the petitioner pointed to one witness who was charged with aggravated robbery but allowed to plead guilty to a lesser-included offense one month after his testimony; he received an eighteen-month suspended sentence and five years of probation. *Id*. The petitioner also pointed to the other witness who was already serving a one-year sentence of imprisonment, but was allowed

---

[4] *See also* Mary Barnard Ray & Jill J. Ramsfield, *Legal Writing: Getting It Right & Getting It Written* 25-28 (2d ed. 1993) (explaining sarcasm should not be used in legal writing because it is inappropriate and too easily taken literally).

to vacate his prior plea agreement and plead to a lesser-included offense; he received a three-month suspended sentence and six months of inactive probation. *Id.* One of the witnesses submitted an affidavit stating that he did make a deal with the prosecution before his testimony and had lied about it during trial. *Id.*

The district court rejected the petitioner's *Brady* claim because it found that there were no preexisting deals. On appeal, this court affirmed:

> To convince us that the district court erred, [the petitioner] must show that the court's factual finding that no deal existed was clearly erroneous. He cannot make that showing. The mere fact that [the witnesses'] sentences were later altered is not evidence that a deal existed prior to their testimony at trial. In fact, at [the petitioner's] trial [one of the witnesses] testified that he hoped to obtain a reduced sentence by reason of his testimony. Likewise, the prosecutor stated that he would consider the witnesses' cooperation in disposing of their pending cases. The other evidence [the petitioner] offers, [the witness's] affidavit, is suspicious on both a legal and a factual basis, as the district court found. Legally, recanting affidavits are always viewed with "extreme suspicion." *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991). . . . Both prosecutors, moreover, testified at the evidentiary hearing that they made no such deal with [either witness]. All these facts led the district court to find [the witness's] affidavit incredible, and require us to hold that that finding was not clearly erroneous.

*Id.* at 707-08.

We find the reasoning in *Williams* persuasive. Like in *Williams*, Matthews has not offered sufficient evidence to rebut the presumption of correctness afforded the Ohio Court of Appeals' factual finding. The fact Roulette entered into a favorable plea bargain within two weeks after Matthews's conviction and sentence is not evidence, or is at most weak circumstantial evidence, that a deal existed at the time of trial. *See Abdur-Rasheed v. Jones*, 100 F. App'x 357 (6th Cir. 2004) (relying on *Williams* and finding that being subsequently charged with a lesser offense is not evidence a witness had a preexisting agreement with the prosecution). Furthermore, like in *Williams*, the assistant prosecutor testified categorically that there was no preexisting deal with Roulette. Given the assistant prosecutor's admission that he supported Roulette's subsequent plea bargain based partly on his testimony but also out of fear for his safety in prison, the approval of the plea bargain is not unusual or exceptional. Like the assistant prosecutor, the judge who accepted Roulette's plea and sentenced him testified that he did not know of any preexisting deal for testimony, although he was aware Roulette received some consideration for his testimony. When considered in this context, the judge's comments made during Roulette's hearing are not direct evidence of a preexisting agreement, but only of his understanding that one of the bases for the plea agreement was the defendant's prior cooperation. Finally, like in *Williams*, we view Roulette's recanting testimony with "extreme suspicion." Simply put, Matthews has failed to come forward with sufficient direct or circumstantial evidence to rebut the state court's finding of no preexisting deal.

As Matthews has failed to show the existence of preexisting deal, his *Brady* claim necessarily fails.

## IV

For the preceding reasons, we **REVERSE** the district court's grant of conditional habeas corpus to Matthews and direct the district court to dismiss his petition.